UNITED STATES of America, by Ramsey CLARK, Attorney General, Plaintiff,

v.

H. K. PORTER COMPANY, Inc., a corporation, United Steelworkers of America, AFL–CIO, an unincorporated association, and Local Union No. 2250, United Steelworkers of America, an unincorporated association, Defendants.

Civ. A. No. 67–363.

United States District Court
N. D. Alabama, S. D.

Dec. 30, 1968.

50

Ramsey Clark, Atty. Gen., Stephen J. Pollak, Asst. Atty. Gen., Macon L. Weaver, U. S. Atty., Frank M. Dunbaugh, Thomas Ewald, Alfred Blumrosen and Andrew J. Ruzicho, Attys., Dept. of Justice, for plaintiff.

Lucien D. Gardner, Jr., William F. Gardner, Drayton T. Scott and Drayton Nabors, Jr.. Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., for H. K. Porter Company.

Jerome A. Cooper, Cooper, Mitch & Crawford, Birmingham, Ala., for United Steelworkers of America.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION

ALLGOOD, District Judge.

Invoking section 707 of Title VII of the Civil Rights Act of 1964,[1] the plaintiff brought this action against the H. K. Porter Company (herein referred to as "the Company") alleging a pattern or

1. 42 U.S.C.A. § 2000e, et seq.

practice of resistance at the Company's Connors Steel plant in Birmingham, Alabama. The United Steelworkers of America and its Local Union No. 2250 (herein collectively referred to as "the Union") were thereafter joined as defendants pursuant to order of the court as parties needed for just adjudication under Rule 19 of the Federal Rules of Civil Procedure.

It has been observed with some truth that judges are too busy to write short opinions and therefore write long ones. At the outset, therefore, the court should say that the length of this opinion is in direct relation to the substantial, complex, and important dimensions of the case, both in the proceedings before trial, in the trial itself, and in study by the court of the evidence and the briefs following completion of the trial.

The pre-trial proceedings included not only enough use of the discovery procedures to fill several court files but the holding of two pre-trial conferences as well. The first pre-trial conference was adjourned by the court at the joint request of counsel to permit the preparation of a proposed order defining the issues of fact to be tried. When this was not productive of agreement, the court held another conference and at that time entered a pre-trial order based upon the proposed order which had been originally prepared by the plaintiff.[2]

Moreover, when the matters covered during the trial raised issues which had not been set forth in the pre-trial order, the court allowed their introduction in the interest of full and final adjudication and has considered them as issues in the case as if they had been embodied in the pre-trial formulation of the issues.

The case was tried before the court on eight days between August 12 and August 21, 1968 in a comprehensive and exhaustive presentation of the evidence. Thereafter, following several extensions of time requested by the plaintiff, the post-trial briefs were filed in November.

Through a pre-trial brief filed by the Company, several briefs filed by the plaintiff during the trial, and the post-trial briefs, the court has had the benefit of comprehensive briefing. It has similarly been most helpful to the court in analyzing the legislative history of Title VII in context to have been provided both with photocopies of the pages of the Congressional Record setting forth the prepared explanations and analyses of the provisions of this title and with the compilation of the legislative history which has been prepared and published by the Equal Employment Opportunity Commission.[3]

## I.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on careful observation of the witnesses and consideration of their testimony during the trial and on detailed

2. After the defendants had expressed agreement with the proposed pre-trial order prepared by the plaintiff, with minor modifications, the plaintiff filed a second proposed pre-trial order. The court found that the proposed order originally prepared by the plaintiff and agreed to by the defendants with modifications set forth the more accurate definition of the issues of fact to be tried and entered it as the pre-trial order.

3. This compilation is entitled Legislative History of Titles VII and XI of Civil Rights Act of 1964.

Another helpful compilation is set forth in The Civil Rights Act of 1964 (BNA 1964), which is the volume referred to by the Court of Appeals in Jenkins v.

United Gas Corp., 400 F.2d 28 (5th Cir. 1968).

However, neither compilation contains all of the passages of the legislative history which have been furnished to the court by means of photostated copies of the Congressional Record.

In the interest of complete citations, the passages of the legislative history herein referred to are cited by their page numbers as they appear in the bound volumes of the Congressional Record and, where applicable, as they appear in the compilations of the legislative history. For this purpose, the Commission's compilation will be referred to as "Legislative History" and the BNA compilation will be referred to as "BNA".

study of the evidence and the briefs since the trial, the court is firm in entering the findings of fact and the conclusions of law which follow therefrom.

Before doing so, the court should comment on the approach which has been taken in deciding this case.

■ The court is aware of the fact that through the litigation of section 707 cases, the Attorney General is seeking to establish general propositions regarding the application of Title VII to certain employment situations and actions.[4] But while recognizing the desirability for enforcement purposes of having general propositions answered by the judiciary in categorical terms one way or the other, the court is convinced that both the proper administration of the statute and the goal of equality in employment opportunities will best be served by the essentially pragmatic approach of judging each case in the light of its own facts and the actual problems to be resolved. As the Supreme Court said in declining the Government's request for the promulgation of definitive standards in the context of a tax statute, "while the principles urged by the Government may, in nonabsolute form as crystallizations of experience, prove persuasive to the trier of facts in a particular case, neither they, nor any more detailed statement than has been made, can be laid down as a matter of law * * * the question here remains basically one of fact, for determination on a case-by-case basis."[5]

Moreover, the mechanistic approach urged by the Attorney General would be manifestly incompatible with the traditional principle of equity jurisdiction that decrees are to be molded to the circumstances of the particular case. The thought expressed by Justice Douglas is a sound proposition although set forth in a dissenting opinion, and it speaks equally to the subject here: "If the federal court is to be merely an automaton stamping the papers an Attorney General presents, the judicial function rises to no higher level than an IBM machine. Those who grew up with equity and know its great history should never tolerate that mechanical conception."[6]

The court further believes that some of the concepts which have been urged as the solutions in this area provide more academic interest than practical answers to actual problems. The concepts of "status quo", "rightful place", and "freedom now" provoke stimulating thought, but they are, after all, no more than labels which can too easily lend themselves to serving as substitutes for critical analysis or, in the words of Judge Learned Hand, as "anodynes for the pains of reasoning."[7]

For these reasons, the findings, conclusions, and order which are here entered are based on the particular evidence of this case and not on categorical answers to the broad propositions urged by the Attorney General.

4. Statement by Assistant Attorney General Pollak before the Labor Relations Section of the American Bar Association (1968).

5. Commissioner v. Duberstein, 363 U.S. 278, 289–290, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). As Justice Holmes observed in a similar vein, "a court does all that its duty compels when it confines itself to the controversy before it. It cannot be required to go into general propositions or prophetic statements of how it is likely to act upon other possible or even probable issues that have not yet arisen." Barker Painting Co. v. Local No. 734, Brotherhood of Painters, 281 U.S. 462,

463–464, 50 S.Ct. 356, 74 L.Ed. 967 (1930).

6. United Steelworkers v. United States, 361 U.S. 39, 71, 80 S.Ct. 1, 9, 4 L.Ed.2d 12 (1959).

7. Commissioner of Internal Revenue v. Sansome, 60 F.2d 931, 933 (2d Cir. 1932), cert. denied, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575 (1932). As Justice Cardozo said in a similar vein, "Catchwords and labels * * * are subject to the dangers that lurk in metaphors and symbols, and must be watched with circumspection lest they put us off our guard." Henneford v. Silas Mason Co., 300 U.S. 577, 586, 57 S.Ct. 524, 528, 81 L.Ed. 814 (1937).

The court will set forth these findings and resulting conclusions in the order which provides the most logical development of the facts in their entirety. This order of analysis should therefore not be taken as an expression of the relative importance of any subject or fact in the case.

To expedite reference to specific subjects, the court will prepare and attach to this opinion an index of the subjects herein analyzed.

*A. General:*

1. (a) The pattern or practice averred by the complaint and amended complaints is alleged to have been engaged in at the Company's Connors Steel plant located in this judicial district, and the employment records relating thereto are maintained and administered in this district.

(b) The Attorney General is authorized to have brought this action by section 707 of Title VII, the Company and the Union are both within the coverage of the provisions of Title VII, and the court has jurisdiction of the parties and the subject matter of this action.

2. The Company is engaged at its Connors Steel plant in the production of steel products, consisting primarily of bars, angles, and shapes. Described in brief outline, the production process follows the sequence of melting raw materials in electric furnaces to produce molten metal, casting the molten metal into billets by means of a four story high continuous casting facility known as the tower (which was installed in 1964 as one of the first such facilities in the country), rolling the billets on the rolling mills to the specified sizes and shapes, and then fabricating and finishing the products.

3. (a) The jobs and the employees which are the subject of this case are primarily in the production and maintenance bargaining unit, for which the Union is and has been the collective bargaining representative since the early 1940's. The only non-supervisory employees who are not within the production and maintenance unit are the guards, supply house employees, and clerical personnel.

(b) There are some 739 production and maintenance employees, of which 418 are white and 321 are Negro.

4. The Union contract which was in effect at the time that this case was tried was a three year agreement which had become effective on October 1, 1965 and expired on September 1, 1968. Since then, the Company and the Union negotiated and entered into a new contract which became effective on September 1, 1968.[8]

5. (a) The operations of the Company's plant are set up on a departmental basis in accordance with the type of work performed by each department and in common with the organizational structure of plants in the steel industry generally. The departments, and their basic functions, are as follows, in alphabetical order:

(1) Brickmason, which relines and maintains the furnaces, ladles, tundishes, and related equipment used in the melting and casting operations.

(2) Building Maintenance, which maintains the plant buildings and facilities.

(3) Cold Draw, which produces cold drawn bars to a close tolerance finish by drawing or pulling semi-finished bars through dies.

(4) Electric Furnace, which produces the billets by melting the raw materials in electric furnaces and casting the molten metal through the continuous casting tower.

(5) Electrical, which consists of the electrician jobs and the craneman jobs which operate the overhead cranes throughout the plant.

(6) Fabricating, which shears, bends, and forms bars to be used as concrete reinforcing material.

---

8. So that the record would be brought up to date, the court has received the 1968 contract into evidence.

(7) Finishing, which performs such finishing operations as angle straightening, reshearing operations, weighing, and shipping. This department is also referred to as the Hoop Shop, which is the name used in the days before the creation of the departments.

(8) Laboratory, which performs chemical and metallurgical analyses of the molten metal, continuous casts, billets, and finished products.

(9) Mechanical, which consists of the machine shop, carpenter shop, blacksmith shop, mechanics, welders, and millrights.

(10) Mill Auxiliary, which performs auxiliary functions before, during, and after the rolling of the steel products on the rolling mills.

(11) Mill Rolling, which performs the rolling functions on the rolling mills. This department is also referred to as Mill Tonnage because the incentive rate of the department is based on the tonnage of steel products which are rolled.

(12) Rail Yard, which cuts scrap with acetylene torches and moves billets to storage areas in the yard. This department is also referred to as the Railbreaker because one of the functions formerly performed there was the breaking of rails.

(13) Roll Shop, where the rolls which are used on the rolling mills are machined to the specified tolerances on roll turning lathes.

(14) Switch Yard, which consists of the locomotive engine used in the switching of railroad cars and the locomotive crane used to deliver scrap metal to the Electric Furnace department to be melted.

(15) Supply, which receives and stores materials used in the plant operations.

(16) Guard (also known as Plant Protection), which consists of the watchmen. (Supply House and Guard are listed last because they have not been the subject of any allegations or argument).

(b) The court finds from the evidence that the jobs within each department require skills and abilities which differ from one department to another and that each department has a specific function of its own in the overall operations of the plant. The court similarly finds that the departmental structure of the plant provides the benefit to the Company and to employees of becoming proficient in and accustomed to the particular type of operations performed by a department.

(c) The departmental structure was for the most part created from the then existing shops and crews when the Union was organized in the early 1940's. For example, the Electric Shop became the Electrical department, the Fab Shop became the Fabricating department, the Hoop Shop became the Finishing department, the Mill Auxiliary Crew became the Mill Auxiliary department, and the Mill Rolling (also referred to as Tonnage) Crew became the Mill Rolling department.

There are three departments which were established subsequent to the organization of the Union. They are the Building Maintenance department, the Cold Draw department, and the Switch Yard department.

6. (a) The majority of the jobs are arranged in lines of progression within their departments, by which employees advance from the entry job through the progression line to the highest rated jobs in the department.

There is one line of progression in each of the departments except the Mechanical department, which is composed of the Machine Shop progression line, the Blacksmith progression line, the Millwright-Welder progression line, the Mechanic progression line, and the Carpenter Shop progression line.

(b) The evidence shows that with one exception, which is discussed below, the jobs in the lines of progression provide training and experience for the successive higher rated jobs in the progression line and that the employees holding jobs in a line of progression are dependent upon one another both for the proper performance of their jobs and for their safe-

ty in this hazardous steel producing industrial plant, and the court so finds.

An example is provided by the jobs of Rougher and Manipulator Operator in the Mill Rolling department. The Roughers are stationed on the breakdown mill on moving tilt tables which are controlled from an overhead pulpit by the Manipulator Operator. The Roughers are dependent upon the Manipulator Operator to raise and lower the tilt tables at the proper times, in coordination with the movement of bars through the mill, and if the Manipulator Operator should fail to do so, one result would be the delivery of the red hot bar in the face of the Rougher.

(c) The only evidence to the contrary consisted of the position, expressed by the Company in the argument of a grievance several years ago, that the jobs in the Carpenter Shop "were not such that they afforded training for employees to become qualified carpenters." Based on this evidence, the court finds that the jobs in the Carpenter Shop line of progression constitute an exception to the fact that the jobs in the lines of progression provide training for the successive jobs in the progression line.

7. Advancement in the lines of progression is by means of temporary step-ups and advancement on permanent assignments.

The temporary step-ups take place daily and constantly by reason of such factors as temporary increases in operations, vacations, and absenteeism. The result is that unlike the situation in some industrial plants, where an employee holds and works a definite job until selected for promotion to the next higher job, the procedure at this plant is that there are daily step-ups and that an employee may therefore work several jobs in a progression line in one work week.

An employee is regarded as having advanced to a job on permanent assignment when, at a normal level of operations and with all of the employees working, he is regularly scheduled to work that job or higher rated jobs and will not be scheduled to work a lower rated job.

8. (a) An employee may decline to advance in the line of progression and thus freeze himself voluntarily on a job, for such reasons as preferring the work or desiring to stay on the shift to which he is assigned on the job.

(b) An employee who is deemed by the Company to lack the ability to perform the duties of the job which he is working is subject to being disqualified and thus involuntarily frozen on the job below it in the progression line.

(c) An employee who has voluntarily frozen has the right to unfreeze himself and to resume advancing in the line of progression. An employee who has been involuntarily frozen similarly has the right to another try at the job from which he was disqualified and to resume advancing in the line of progression if he can satisfactorily perform the job. An employee who has been involuntarily frozen has the further right to file a grievance through the Union challenging the disqualification.

9. There is a Labor Pool, which is composed of employees who work in general labor jobs such as truck driver and fork lift operator and newly hired employees who start in the Labor Pool before transferring to departments.

10. Prior to the Fall of 1962, there was racial segregation in the jobs, so that in departments having employees of both races, there was one line of progression composed of white employees and another line of progression composed of Negro employees. In the Fall of 1962, the Company signed a compliance agreement under Executive Order No. 10925, which had been issued by President Kennedy in 1961 and provided for equal employment opportunity by companies entering into and holding Government contracts, and, in implementation of the Order, the Company and the Union integrated the lines of progression in October of 1962.

██ The Attorney General has argued that this merger of the lines of progression placed the Negro employees "at the bottom of each line of progression." However, this argument is not sustained by the evidence. Instead, the evidence shows, and the court finds, that the standard which was adopted and applied by the Company in determining the placement of jobs in this integration of the progression lines was the base wage rate of the jobs and that the result of the application of this standard was that in three of the integrated progression lines, Negro employees were placed in higher rated jobs ahead of white employees in lower rated jobs and have since then continued to progress ahead of the white employees.

11. This case has more than once given the impression of being concerned with different frames of reference from the standpoint of time, with the Attorney General having introduced considerable evidence and having placed substantial reliance on events occurring prior to July of 1965 when Title VII became effective and, for that matter, prior to October of 1962 when the lines of progression were integrated. Therefore, before proceeding to analysis of the specific facts, it would be in order to comment on the period of time encompassed by the case.

██ On this point, the court is of the opinion that because the present cannot be fully analyzed and understood without consideration of the past, evidence of past events antedating the effective date of Title VII is competent and relevant. In this case, therefore, the evidence regarding events antedating both the effective date of Title VII in 1965 and the integration of the progression lines in 1962 was admitted and has been considered by the court for this purpose.

## B. Reports by the Equal Employment Opportunity Office:

The status of the Company's compliance with the Executive Order was under the jurisdiction of the Equal Employment Opportunity Office of the Army Materiel Command, which in turn functioned under the then President's Committee on Equal Employment Opportunity. Beginning in 1963 and continuing into 1965, the Company's equal employment opportunity program was the subject of periodic reviews, inspections, investigations, and discussions which were for the most part conducted by Dr. Hugh A. Brimm, who was at the time Chief of the Equal Employment Opportunity Office and is now with the Civil Rights Office of the Department of Health, Education and Welfare.[9]

The result of these contacts by the Equal Employment Opportunity Office was a series of written reports expressing the findings or opinions that the Company was in compliance and was not discriminating against Negro employees.[10] For example, the general tenor of these reports may be illustrated by one report which stated that "Negroes have moved into some of the jobs very close to the top" and by another report which stated that "It is believed that Connors Steel Division has a good equal employment opportunity posture and the Company is attempting to improve constantly."

The contacts by the Equal Employment Opportunity Office further included the advice, received by the Company in 1964, that "Your testing program appears to be appropriate and properly administered" and the advice, received by the Company in 1965, that the adoption of a transfer privileges procedure (hereinafter to be discussed) "will achieve the desired compliance posture".

The Company's introduction of evidence regarding these matters and the

9. The title refers to a Doctor of Theology degree.

10. The Attorney General objected to the characterization of "findings" and used instead the characterization of "opinions". The court will avoid this immaterial semantical squabble by using both terms.

Attorney General's insistence that the evidence was completely immaterial brought about still another contested issue in this complex case.

The initial ground of the Attorney General's objection to this evidence consisted of the argument that the status of compliance with the Executive Order must be treated as irrelevant to the determination of compliance with Title VII and that the actions taken by the Equal Employment Opportunity Office could not be binding on the court.

 The court is fully in agreement with the Attorney General that the status of compliance under the Executive Order is in no way conclusive or binding on the court. The question of compliance vel non must be measured solely within the framework of Title VII, and it is therefore both the right and duty of the court to adjudicate this case within the framework of Title VII and without being bound in the least by the status of compliance as determined by the agencies administering the Executive Order. The court therefore holds, in agreement with the Attorney General, that the reports by and advice from the Equal Employment Opportunity Office are in no way res judicata, binding, or grounds of estoppel.

But it is quite another and different matter to say that evidence regarding the actions taken by the Company to comply with the Executive Order and the reports and approvals by the Equal Employment Opportunity Office must be treated as "irrelevant and not pertinent to the issues in the case" as urged by the Attorney General.

The Company has argued that this evidence is relevant with respect to the element of section 707 that the alleged pattern or practice be intended to deny the exercise of rights, in that statements such as "the Company is attempting to improve constantly" may be considered on the issue of intent. It is further argued by the Company that compliance with the Executive Order may be considered in connection with compliance with Title VII for the reason that Senator Humphrey spoke of the title as being "much less stringent language, and much less in coverage than what was provided by the executive order".[11]

However, it is not necessary for purposes of this case to resolve these points. The Attorney General has based its case almost entirely on the situation which existed before October of 1962 and on the argument that the steps taken by the Company in October of 1962 were inadequate to constitute compliance with Title VII when it became effective in 1965. Therefore, with the Attorney General having opened this door in presenting its case, it would be most anomalous to close this door to the defendants in presenting their case.

At the trial, the Attorney General raised the further contention that in advising the Company that its testing program was proper and fairly administered and that the adoption of the transfer procedure would achieve the desired compliance posture, Dr. Brimm acted beyond the scope of his authority as Chief of the Equal Employment Opportunity Office. However, since the court has held, in agreement with the plaintiff, that the actions taken by Dr. Brimm are in no way binding in the case, this question is academic.

The Attorney General's third point on this issue, argued in the briefs, is that the reports written by Dr. Brimm were based on "inadequate investigations". But this argument speaks to the weight to be given to the evidence and not to the question of admissibility. Moreover, the only evidence touching on this point was Dr. Brimm's testimony that "My contact with the company was a continuing contact over a period of approximately two years."

 In sum total, the court agrees with the Attorney General that the reports and approvals are not in the least binding or conclusive, but it cannot agree that they are completely immaterial and

---

11. 110 Cong. Record 13088 (June 9, 1964); Legislative History, p. 3107.

must be entirely disregarded. The court is instead of the opinion that they may properly be considered as another item of evidence together with all of the other considerable evidence in the case. At the same time, however, the court has at no point in analysis of this case relied on any finding or opinion expressed by these reports and advice.

*C. Advancement in the lines of progression:*

1. Following the integration of the lines of progression, the Negro employees who were then employed began advancing in the merged lines of progression into jobs which had theretofore been held by white employees, with the result that in the month of October of 1962, there were 63 shifts worked by Negro employees in jobs which had previously been held by white employees.

The Negro employees who have been hired and who have transferred into departments subsequent to October of 1962 have similarly been advancing in the integrated lines of progression.

2. The Attorney General has emphasized in argument the fact that there are no Negro employees in the Building Maintenance department, Laboratory, Machine Shop, and Mechanic progession line and that the Negro employees in the Blacksmith Shop and Roll Shop have not advanced. The court agrees with these facts emphasized by the Attorney General but cannot find that they show denials of equal opportunities in employment. For example, there are only three employees in the Building Maintenance department, seven employees in the Laboratory, three employees in the Blacksmith Shop, and two employees in the Mechanic progression line. Similarly, it was shown by the evidence that the reason the Negro employee in the Roll Shop has not advanced was that he was disqualified from the Craneman job in 1963, and there is no evidence or argument from which it might be inferred that such action was improper.

3. Having considered this argument relied on by the Attorney General, the court should now consider the evidence regarding the advancement of the Negro employees in the other departments of the plant. On this point, the court finds that as the result of the fact that they have been advancing in the integrated lines of progression since October of 1962, the jobs to which Negro employees had advanced at the time of the trial were as follows, with the level of the jobs in the progression lines being set forth to provide an explanation of the situation:

(a) In the Brickmason department, to Brickmason, which is, except for the Leaderman, the highest rated of the four jobs in the department.

(b) In the Carpenter Shop, to Painter, which is the third job from the top of the seven jobs in the department.

(c) In the Cold Draw department, to Record Clerk, which is the third job from the top of the twenty-one jobs in the department.

(d) In the Electrical department, to Spell Craneman—Charging and Charging Maintenance, which is the seventh job from the top of the twenty-six jobs in the common line and the craneman line of the department.

(e) In the Electric Furnace department, to Melter Helper (also known as Furnace Operator), which is the second job from the top of the twelve jobs in the department.

(f) In the Fabricating department, to Tagman, which is the third job from the top of the twenty-one jobs in the department.

(g) In the Finishing department, to Straightner Operator, which is the second job from the top of the fifteen jobs in the department.

(h) In the Mechanical department, to Millwright, which is, except for the Leaderman and the Foreman, the highest rated of the seven jobs in the common line and the Millwright line of the department.

(i) In the Mill Auxiliary department, to Inspector, which is the highest rated of the twenty-one jobs in the department.

(j) In the Mill Rolling department, to Layover, which is the thirteenth job from the top of the nineteen jobs in the department.

(k) In the Rail Yard department, to Burner, which is now the highest rated of the seven jobs in the department. (Scarfer, which was the highest rated job, is no longer in operation).

(l) In the Switch Yard department, to Locomotive Crane Operator, which is the highest rated of the four jobs in the department.

The court similarly finds that as a result of the fact that they have been advancing in the lines of progression since October of 1962, Negro employees were at the time of the trial holding permanent assignments on jobs which are among the higher rated jobs in the plant. Such jobs held by Negro employees on permanent assignment include the jobs of Locomotive Crane Operator in the Switch Yard department, Brickmason in the Brickmason department, Millwright in the Mechanical department, Towerman in the Electric Furnace department, Weighman in the Finishing department, Shear Leaderman in the Fabricating department, Draw Bench Operator in the Cold Draw department, and Craneman in the Electrical department.

4. While not disagreeing with the evidence regarding these jobs which are held by Negro employees, the Attorney General has responded to it by the argument that the Company was defending on the ground that "improvement" in employment opportunities is enough.

■■■■ The court fully agrees with the Attorney General that improvement in employment opportunities cannot in and of itself constitute compliance with the rights secured by Title VII. But at the same time, the court has heard nothing from the defendants, in argument or in evidence, from which it could be inferred that exoneration was being sought on a defense of improvement. Moreover, with the Attorney General having placed considerable reliance in argument and in evidence on events antedating October of 1962, the court could not fairly or reasonably deny the defendants the right to present evidence regarding events which have taken place since October of 1962.

*D. Transfers between departments:*

1. Prior to the negotiation of the Union contract in 1965, an employee who transferred from one department to another lost the seniority which he had accumulated in the department from which he transferred. Therefore, if he subsequently returned to that department, he had to start over again as a new employee at the bottom of the departmental seniority list. For this reason, employees who transferred to another department and then found they did not like or could not perform the work in the new department could not return to their former departments and regain their seniority. Similarly, in case of a reduction in force in their new departments, employees ran the risk of being laid off because they could not return to their former departments and work there with their retained seniority.

This was illustrated in the evidence by cases of employees (who were white) who transferred prior to 1965 from one department to another, were cut back due to reductions in force in their new departments, and returned to their former departments as new men at the bottom of the seniority list.

2. This matter was the subject of discussions in 1965 between the Company's Vice-President B. Campbell Blake and Dr. Brimm of the Equal Employment Opportunity Office. As related in more detail in one of the reports produced by the Attorney General pursuant to Rule 34 discovery in this case, the circumstances were that "the Negro complainants most frequently referred to the fact that in order to transfer from one line of progression, they would have to give up their seniority in the line that they were leaving" so that "in the event of a cut-back or lay-off, then they would be faced with the possibility of having to go out on the street" and that "This bar-

rier to transfer was pointed out to Management".

The result of these discussions was that Vice-President Blake proposed to Dr. Brimm the adoption of a new transfer procedure to encourage transfers between departments by the Negro employees. Specifically, he proposed that the Company would adopt a procedure by which employees who transfer between departments would retain in the department from which they transferred the seniority they had accumulated so they could then return and regain their accumulated seniority if they wished to do so or if they needed to do so because of a reduction in force.

3. This proposed transfer procedure was drafted and submitted by the Company to Dr. Brimm for review, and he advised the Company in reply that he had discussed the proposal with his Washington office and that "I have a concurrence from them that this change will achieve the desired compliance posture."

The Company thereafter presented this proposed procedure to the Union in the contract negotiations which were being held in that year. The procedure was then agreed to, incorporated in the contract as the transfer privileges section, and became effective as of October 1, 1965.

This new transfer procedure was called to the attention of the employees by being printed in bold face type in the contract as printed in the Employees Handbook distributed to employees by notices which were posted on the bulletin boards, and by notices which were enclosed in the employees' pay envelopes. It was also discussed at Union membership meetings at the time it was negotiated and placed in the Union contract.

 4. There can be no doubt from the evidence, there is no contention to the contrary, and the court finds that this transfer privileges section was adopted by the Company and the Union for the benefit of the Negro employees and to encourage Negro employees to transfer to departments providing greater opportunities for earnings and advancement.

The evidence before the court similarly provides several examples of the advantages offered by this transfer privileges section. For one, the evidence shows cases of Negro employees who have transferred and then have returned to their former departments with their retained seniority. Another advantage shown by the evidence is that because of this transfer privileges section, employees are now provided with steady work while they build up enough seniority in their new departments to be regularly scheduled, in that they are able to work in their former department as well as in their new department. This was illustrated by the testimony of one of the witnesses for the Attorney General that he had transferred from the Mill Auxiliary department to the Mill Rolling department some three weeks before the trial and was at the time of the trial working in both departments until he had enough seniority to be scheduled regularly in the Mill Rolling department.

 5. The fact that a procedure which has been adopted for the benefit of Negro employees is unique is certainly a long way from proving compliance with the law, since that is a question which must be answered in terms of the requirements of the statute and not in terms of the situation within the industry. At the same time, it is relevant, as a point bearing on the circumstances of the proposal and adoption of the transfer privileges section, that the common situation in the steel industry is that employees forfeit their seniority when they transfer and are not able to hold seniority rights in more than one department or promotional sequence and that the transfer section adopted by this Company and Union is unique.

6. With this background, the court will now consider the arguments advanced by the Attorney General in attacking the transfer privileges section.

By way of preface, it should be said that in analyzing this issue, the court has excluded from consideration both the fact that the transfer section was proposed by the Company for the benefit of Negro employees and the fact that the Company was advised that the adoption of this transfer section would achieve the desired compliance posture.

 7. To begin with, during the pre-trial stages of the case, there was some contention by the Attorney General to the effect that the transfer privileges section imposed requirements on Negro employees to which white employees are not subject.

However, the evidence conclusively established that white employees are identically and equally subject to each of the requirements for transfer. The evidence shows that white employees must meet the minimum aptitude standards of the departments to which transfer is requested, that there has been no relaxation of this requirement for white employees, and that there have been white employees whose transfer requests have been denied on this ground at the same time that Negro employees have been transferred to the departments unsuccessfully requested by the white employees. The evidence likewise shows that white employees who transfer must start in the entry job in the new department and from there work their way up the line of progression, must take a wage reduction where the rate of the entry job in the new department is less than the rate of the job which they held in the former department, and do not take with them in transferring the seniority which they accumulated in the department from which they transferred. The court therefore finds that these are the facts.

Moreover, the pre-trial contention on this aspect of the subject may now properly be regarded as having been withdrawn, since the Attorney General has agreed in the post-trial brief that the requirements for transfer apply to both white and Negro employees.

8. Instead, the theory which the Attorney General urges in the post-trial brief is that there should be no requirements for transfer, that "unrestricted transfers should be permitted to vacant jobs", and that the court should order the abolishment of the departmental seniority structure and the creation of a new plant-wide seniority and job bidding system.

This theory is the principal point of the Attorney General's comprehensive post-trial brief. The argument is that the transfer privileges section should be abolished and replaced by an "unrestricted transfer" plan by which the present system of departmental seniority would be abolished and replaced by a system of plant-wide seniority and by which the present procedure of advancement in the lines of progression would be abolished and replaced by a plant-wide bidding procedure.

This result is necessary, in the Attorney General's view, to compensate the Negro employees for the segregation which existed prior to October of 1962 and to achieve a more proportionate racial balance in the departments.

To illustrate this point, the Attorney General's brief compares the employment histories of Negro and white employees who were hired in years prior to 1962 and argues that the Negro employees must be given these unrestricted plant-wide transfer and bidding rights to place them where they might have been had it not been for the situation which existed prior to 1962. For one example, the Attorney General compares the employment history of a Negro employee in the Electric Furnace department who was hired in 1953 with the employment history of white employees who were also hired in 1953 and argues that the plant-wide transfer and bidding plan is necessary to compensate for the fact that the white employees were able to work their way up to their present status during the years before 1962.

Similarly, to illustrate the point of the theory that the transfer and bidding plan

is necessary to achieve a proportionate racial balance throughout the departments, the Attorney General has prepared and relies on numerical and percentage distributions of Negro and white employees in each of the departments.

With the Attorney General proposing this plant-wide bidding system as the means of compensating Negro employees for the years prior to 1962 and to achieve a proportionate racial balance, the initial question which is raised is whether Title VII should properly be construed as speaking prospectively or retroactively from the time it became effective in July of 1965.

The theories which have thus far been expressed on this question have tended to view the matter in terms of absolute and immutable concepts.

The concept urged by the Attorney General is that Title VII must be construed as requiring that Negro employees be placed where they might have been today had it not been for segregation which existed before Title VII became effective. For this concept, the Attorney General relies on the decisions of Judge Heebe in the *Crown Zellerbach* case and of Judge Butzner in the *Philip Morris* case [12] and the law review espousals of the "rightful place" concept.[13]

Another view of the matter is that Title VII should properly be construed as having a prospective and not retroactive operation and that it was not intended to require the realignment of rights of seniority as they existed when the title became effective.

This view is represented by several passages of the legislative history, including the memorandum which was prepared by the Justice Department for the co-floor manager of Title VII and which expressed the position that "It has been asserted that Title VII would undermine vested rights of seniority. This is not correct. Title VII would have no effect on seniority rights existing at the time it takes effect * * * This would be true even in the case where owing to discrimination prior to the effective date of the title, white workers had more seniority then Negroes" [14] and by the explanation set forth in the interpretative memorandum of the title by its co-floor managers that "Title VII would have no effect on established seniority rights. Its effect is prospective and not retroactive." [15]

This view is similarly represented by the interpretations expressed by Judge Hogan in the *Dobbins* case,[16] by Judge Meredith in the *Sheet Metal Workers*

12. United States by Clark v. Local 189, United Papermakers and Paperworkers, 282 F.Supp. 39 (E.D.La.1968) ; Hicks v. Crown Zellerbach Corp., (E.D.La. 1968) ; Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968). The Attorney General relies also on Justice Black's statement, in writing for the Court in Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965), that "the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." However, the Court was there concerned with past conduct which was unlawful at the time it was committed rather than with the situation here present of the theory that a decree should be entered to compensate for a past situation which was not proscribed by statute at the time.

13. Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv. L.Rev. 1260 (1967) ; Gould, Employment Security, Seniority, & Race : The Role of Title VII of the Civil Rights Act of 1964, 13 Howard L.J. 1 (1967).

14. Department of Justice Memorandum, prepared for and placed in the Congressional Record by Senator Clark as co-floor manager of Title VII. 110 Cong. Record 7207 (Feb. 8, 1964) ; Legislative History, p. 3043 ; BNA, p. 329.

15. Interpretative Memorandum of H.R. 7152 submitted jointly by Senator Joseph S. Clark and Senator Clifford P. Case, Floor Managers, 110 Cong. Record 7213 (April 8, 1964) ; Legislative History, p. 3043 ; BNA, p. 329.

16. Dobbins v. Local 212, International Brotherhood of Electrical Workers, 292 F.Supp. 413 (S.D.Ohio 1968).

case,[17] and by Judge Gordon in the *Duke Power* case,[18] as illustrated by the passages that "The Civil Rights Act of 1964 was not intended to penalize unions or others for their sins prior to the effective date of the Act. It is prospective only" and that "In providing for prospective application only, Congress faced the cold, hard facts of past discrimination and the resulting inequities. Congress also realized the practical impossibility of eradicating all the consequences of past discrimination."

Having carefully studied this matter and the authorities speaking on the subject, the court has reached the firm conviction that the dogmatic approach of attempting to fit a case into the confines of one or the other theoretical concept is not the answer. We are entering an area of the law which has quite accurately been characterized as a yet uncharted sea,[19] and nothing could be more productive of erroneous results and more detrimental to the purposes spelled out by Congress in the enactment of this statute than to adopt the mechanistic approach of applying one or the other concept.

For example, with specific reference to the subject of transfers, the Attorney General relies on the *Philip Morris* case[20] while the Company relies on the *Duke Power Co.* case.[21] But the fanciful prediction of the day when the judges of our judicial system will be replaced by computers[22] has not yet come, and the courts cannot be expected to sit in computer-like fashion and be fed a control card marked *Philip Morris* on the one hand or *Duke Power Co.* on the other hand to produce the proper decision in every case concerning transfers. That may be the easy approach to the judicial resolution of a case, but it is most as-

suredly not the proper discharge of the responsibilities that a court has under Rule 52.

■ For this reason, and consistent with the overall approach taken in resolving the issues in this case, the court will not select one or the other concept as the answer to this question but will resolve the issues in terms of the particular facts of this case.

■ The court has no doubt that from having heard the evidence in the *Philip Morris* case, Judge Butzner reached the result which was proper on the facts of that case. But this is another case and another set of facts, and this court is thoroughly convinced from having heard the evidence in this case that the facts here will not sustain the result sought by the Attorney General.

This is so for several reasons which do not stand separate and independent of one another but will be discussed separately in the interest of analysis.

(a) First, this is not a case where there have been no opportunities for advancement and higher earnings for Negro employees in the departments to which they were originally assigned and where the only means of advancement has therefore been through transfers to other departments.

A district court judge, more than anyone else, should be mindful of the limitations inherent in attempting to recapture and relate in the pages of a written opinion the total composite of the ingredients of a trial, consisting not only of the recorded evidence but as well the impressions and subleties resulting from the questions of counsel and the answers of the witnesses. As Justice Frankfurter has said, "no finder of fact can see

---

17. United States v. Sheet Metal Workers International Ass'n, 280 F.Supp. 719 (E.D.Mo.1968).

18. Griggs v. Duke Power Co., 292 F.Supp. 243 (M.D.N.C.1968).

19. Chief Judge Lynne in United States v. Hayes International Corp., 295 F.Supp. 803 (N.D.Ala.1968).

20. Quarles v. Philip Morris, Inc., 279 F. Supp. 505 (E.D.Va.1968).

21. Griggs v. Duke Power Co., 292 F.Supp. 243 (M.D.N.C.1968).

22. As related in the September 1968 issue of the American Bar Journal, 54 A.B.A.J. 896 (1968).

through the eyes of any other finder of fact." [23]

Despite these limitations, the opinion in the *Philip Morris* case shows that the court was there dealing with a factual setting where the only route of advancement for the Negro employees was by means of transfer to other departments.

Thus, the facts of the case, as set forth in the opinion, were that the Negro employees with respect to whom relief was granted were in departments composed entirely of jobs which had previously been held by Negro employees. The departments contained no higher rated jobs which had previously been held by white employees, there was accordingly no opportunity for upward mobility within these departments, and the result was that the only means of providing job advancement to the Negro employees in these departments was through transfers to other departments. This was accordingly the result reached by the court in that case.

The facts of this case, on the other hand, are quite different. Each of the departments in which Negro employees were working in 1962 contained higher rated jobs which had until then been held by white employees, the Negro employees with respect to whom relief is here sought have been and are provided with substantial opportunities for job advancement by means of progression into these higher rated jobs, and their advancement into these jobs has been substantial.

(b) Second, the fundamental premise relied on by the Attorney General for the plant-wide transfer and bidding program is the argument that the Negro employees are "locked in low-opportunity departments" without the means of transferring and that the plant-wide bidding program is necessary to enable them to "break out" of the departments in which they are allegedly locked.

There may well be cases where this argument will be based on a factual foundation. The *Philip Morris* case, for one, presented a situation where the opportunities for departmental transfers which were available to Negro employees were obviously limited. This fact is reflected in the court's findings that "Until January 1, 1966 the Company, with token exceptions, established its departmental seniority system on the basis of racial discrimination in its hiring policy," that "not until March 7, 1966 did the Company and the Union amend the collective bargaining agreement to allow employees to transfer from prefabrication under a note of intent at the rate of one a month when vacancies exist to basic labor jobs in warehouse shipping and receiving", that transfers under the note of intent procedure to the fabrication department were within the discretion of management and the recommendation of the employees' supervisors, and that transfers under the six months agreement procedure were limited to four transfers every six months.

But there is nothing in the least comparable in the evidence in this case, and having heard the evidence in this case, the court could not properly accept the argument that Negro employees are "locked in" departments.

■ The evidence in this case first shows, and the court finds, that since October of 1962, the opportunities for transfer available to the Negro employees have been on an identical equality with the opportunities available to the white employees. The evidence similarly shows, and the court finds, that the adoption of the transfer privileges section in 1965 substantially broadened the transfer opportunities available, that the Negro employees have without discrimination availed themselves of the opportunities available under this transfer section, and that those who have done so have advanced substantially in the departments to which they have transferred.

---

23. Commissioner of Internal Revenue v. Culbertson, 337 U.S. 733, 753, 69 S.Ct. 1210, 1220, 93 L.Ed. 1659 (1949).

While not disagreeing with the evidence establishing these facts, the Attorney General has instead placed reliance on the fact that the majority of the jobs in the Finishing, Fabricating, and Mill Auxiliary departments were held by Negro employees prior to October of 1962 and that because most of those Negro employees who were employed in 1962 have not transferred, the majority of the employees in those three departments are Negro.

It is certainly true that "In the problem of racial discrimination, statistics often tell much, and Courts listen."[24] But the courts cannot be expected to listen to only part of the evidence.

 If the evidence had shown nothing more than the statistical fact that a majority of the employees in the Finishing, Fabricating, and Mill Auxiliary departments are Negro, then a factual predicate for the Attorney General's theory might have been established. But that is not the situation presented by the evidence in this case.

The court must in the first place listen to the evidence that the Negro employees have been able to avail themselves without difficulty of the transfer rights provided by the transfer privileges section.

Arguing for a contrary finding on this point, the Attorney General points to the testimony at the trial of a Negro employee that he was not aware of the transfer privileges section until February of 1968, when he saw a notice on the bulletin board regarding openings in several departments. He further testified that he discussed the matter of transfer rights with Personnel Director Norman Wagner at that time, "was pleased with his explanation", and applied for a transfer to the Mill Rolling department, to which he was transferred about a week later.

 However, there is no dispute with the testimony that the transfer privileges section was specifically called to the attention of the employees by notices which were placed in the employees' pay envelopes and which were posted on the bulletin boards, that the Employees Handbook containing the transfer section was made available to the employees, and that the transfer section was discussed and explained at Union membership meetings. Moreover, when this witness was asked if he had ever looked at the Employees Handbook, he replied that he had not done so. Based on the evidence, therefore, the court finds that the Company has adequately publicized the transfer rights available.

The court must similarly find from the evidence that the Negro employees who have availed themselves of the transfer rights available have benefited substantially by doing so. On this point, the evidence shows that at the time of the trial, Negro employees who had transferred from the Finishing, Fabricating, and Mill Auxiliary departments were working in such jobs as Brickmason in the Brickmason department, Craneman in the Electrical department, Ladleman in the Electric Furnace department, and Ringout Saw Operator and Roll Changer Grade III in the Mill Rolling department.

The court must likewise find from the evidence that the transfer rights available provide the opportunity for increased earnings. For example, there is the evidence regarding a Negro employee in the Fabricating department who applied for and received a transfer to the Mill Rolling department in December of 1966 and who had a higher average hourly wage rate during the first six months of 1968 than all but one of the white employees who remained in the Fabricating department when he transferred. The evidence on this point similarly shows that three of the white employees who had lower hourly earnings were hired before he was and that the one

24. State of Alabama v. United States, 304 F.2d 583, 586 (5th Cir. 1962), aff'd per curiam, 371 U.S. 37, 83 S.Ct. 145, 9 L. Ed.2d 112 (1962); United States v. Board of Education of Bessemer, 396 F. 2d 44, 46 (5th Cir. 1968).

white employee who had higher hourly earnings is a foreman who was hired in 1936.

 In the second place, the argument that Negro employees are "locked" in the Finishing, Fabricating, and Mill Auxiliary departments disregards the fact that the employees who are allegedly "locked" in these departments consist primarily of men who have elected not to progress within these departments or who have not requested transfers. Thus, the evidence shows, and the court finds, that the majority of the Negro employees in the Fabricating, Finishing, and Mill Auxiliary departments have voluntarily frozen themselves on jobs and thereby elected not to progress in these departments and similarly that the majority of the Negro employees in these departments have not applied for transfers.

The argument that the Negro employees are "locked" in the Fabricating, Finishing, and Mill Auxiliary departments furthermore disregards the fact, which the court finds from the evidence, that of the Negro employees who have applied for transfers from these three departments during the period since 1962, there have been 9 who were not eligible for transfer while there have been 23 who were eligible for transfer and who were transferred to the departments which they requested, including the Mill Rolling, Electric Furnace, Brickmason, Electrical, and Mechanical departments.

The testimony further established that employees have declined the Company's offers of training for the higher rated jobs of Inspector, Assistant Foreman, and Yardman in the Mill Auxiliary department or have voluntarily given up the jobs after they had been trained. For example, the Attorney General called four Negro employees who are in the Mill Auxiliary department as witnesses. Of these employees, one testified that the Company offered him training on the Yardman job, which he declined because of ulcers, and that the Company then offered him training on the Assist-

ant Foreman job, which he accepted. Another testified that the Company trained him on the Yardman job in 1962 and also trained him on the Inspector job but that he voluntarily gave up both jobs in 1964. Another testified that the Company offered him training on the Inspector job, which he declined, and that he had also elected to decline training for the Yardman and Assistant Foreman jobs as well as the Inspector job. The fourth witness testified that he had received a notice from the Company saying he could become Assistant Foreman.

 This is not to say that failure to take advantage of existing opportunities may in every case be a factor militating against the type of result here sought by the Attorney General. There may well be cases where it would not do so, such as where the opportunities available are minimal or essentially illusory or otherwise properly to be regarded as a case of too little and too late. What the court is saying is that given the facts of this case, establishing beyond question that substantial and meaningful opportunities have been available for years and that those who have availed themselves of these opportunities have proven that the opportunities are real, the Attorney General's argument for the plant-wide transfer and bidding plan for those who have elected not to avail themselves of the existing opportunities has little to commend it.

 (c) Third, the Attorney General has further argued this case on the premise that the departmental structure of the Company's plant is not based on legitimate operational considerations and could therefore be properly replaced by the plant-wide transfer and bidding program.

On this point as well, the argument fitted the facts of the *Philip Morris* case. There were three departments at issue in that case—prefabrication, fabrication, and warehouse shipping and receiving—and the opinion gives no indication of there having been evidence of significant differences in the skills and abilities

required between the departments. On the contrary, the court pointed out that the plaintiff in that case was seeking a truck driver job and that this job "does not depend upon progression from one classification to another in the warehouse shipping and receiving department." Therefore, as Judge Gordon observed in the *Duke Power Co.* case, the factual situation was that "the policy at Philip Morris represented only a relaxation of earlier restrictions based on race" and that "Philip Morris exhibited no business purpose or reason for its transfer restrictions."

But the facts of this case do not in the least lend themselves to the argument. There is on the one hand no evidence from which it could be inferred that the requisite skills and abilities do not differ from one department to another. On the other hand, based on the evidence which it has heard on the point, the court finds that the requisite skills and abilities differ in substantial measure from department to department, that satisfactory job performance in one department is not an accurate predictor of satisfactory job performance in another department, and that the departmental structure of this plant is in fact based on the particular and distinctive type of work performed by each of the departments.

(d) The plant-wide transfer and bidding plan sought by the plaintiff would similarly mean that an employee who has been working in another department performing duties unrelated to the duties of the vacant job would be entitled to claim the job. This might be a perfectly proper result in a case where the circumstances otherwise justified it and where the jobs in the departmental progression lines are not dependent on the prior jobs in the line for training and experience for the job to be filled.

However, this case is one where the factual circumstances do not otherwise justify this result and where the court has found the facts to be that with the exception of the Carpenter Shop, the jobs in the departmental lines of progression provide significant elements of on-the-job training and experience for the successively higher rated jobs in the progression lines. Indeed, there is no dispute with this fact, as the Attorney General has agreed that "The record demonstrates that training is acquired in this plant on the job" and that "the job skills in the plant are acquired by on-the-job training."

For one example, the jobs of Utilityman and Ladle Helper in the Electric Furnace department provide training for the next higher rated job of Ladleman, so that the employees who have worked their way up through the Utilityman and Ladle Helper jobs are prepared to step into the Ladleman job and perform it satisfactorily and without creating a danger of injury to themselves and their fellow employees. But under the unrestricted plant-wide transfer and bidding system which the Attorney General has proposed, an employee who has been working in another department in a totally unrelated job and has absolutely no training, experience, or familiarity with the hot metal ladles or their operation would be entitled to claim the Ladleman job in accordance with his length of service with the Company.

There is nothing but the arguments in the briefs that this could be accomplished, and the arguments of counsel, no matter how compelling, are not acceptable substitutes for evidence. Furthermore, there is on the contrary the evidence from which the court has found that the men working jobs in the progression lines at this plant are in fact dependent upon one another for their safety in a hazardous industry.

 It likewise cannot be assumed, in the absence of evidence, that the employees in this steel mill are in no danger of injury from the performance of the jobs around them by employees with less than the full amount of experience, including as it does jobs which require contact with ladles containing hot molten metal, the operation of equip-

ment moving red hot bars through the rolling mills, the operation of overhead cranes, and the operation of pickle tanks filled with acid. For the courts as well, it must necessarily require more than speculation and arguments in briefs before assumptions can be made about the experience needed for the proper and the safe performance of jobs in a steel mill, and the record in this case simply will not justify such an assumption.[25]

The sum total of the matter is that this case, perhaps uniquely, combines the factual points that substantial opportunities of upward mobility have been provided through progression into the higher rated jobs, that substantial opportunities of horizontal mobility have been provided through the rights of transfer existing since 1962 and broadened by the adoption of the transfer privileges section in 1965, that there are significant differences in the skills and abilities required between departments, and that the employees with respect to whom the Attorney General here seeks relief have for the most part elected to decline the progression opportunities available to them in their present departments or have not sought to take advantage of the transfer opportunities available to them.

Therefore, based on the combined total of these factual points which the court has found from the evidence, the court is firm in finding that the position urged by the Attorney General is entirely inappropriate in the factual setting of this case. Given the evidence in this case, even if the court applied the philosophy expressed in the *Philip Morris* case that "Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act", the facts here would not sustain the result there reached, for here the Negro employees are not frozen into discriminatory patterns and to the contrary have and have had substantial opportunities of transfer, training, and progression available to them.

■ 9. While the facts of the case are enough without more, the court should for complete analysis comment on the Attorney General's theory that the plant-wide transfer and bidding plan is necessary to achieve a proportionate racial balance throughout the various departments.

This theory in the first place assumes that Negro employees have not had any meaningful opportunities of departmental transfers. However, the evidence in this case will not sustain that assumption, and the court has found from the evidence that the facts are to the contrary.

Moreover, entirely aside from that aspect of the matter, it is difficult to reconcile this theory with the teaching of the legislative history. In a speech delivered in the Senate in January of 1964, Senator Hill pointed out the objections which he had to the provisions of Title VII of the then pending bill, including the objections of preferential treatment, racial balances, and alterations in seniority systems. It was in specific reply to this speech in opposition that Senator Clark, as co-floor manager of Title VII, placed in the Congressional Record a memorandum prepared by the Department of Justice "in rebuttal to the argument made by the Senator from Alabama to the effect that title VII would undermine the vested rights of seniority * * * and that title VII would impose the requirement of racial balance." This memorandum explained that "Title VII would have no effect on seniority rights existing at the time it takes effect" and that "There is no provision, either in ti-

---

25. In a similar context, the court in the *Dobbins* case refused to make assumptions about the possession of qualifications for the electrician trade in the absence of some evidence to sustain the assumption and stated on the point that while it is one thing to assume that a significant number of a group have the qualifications for schooling or voting or jury service, it cannot be assumed without evidence that they have the qualifications to perform in a given trade.

tle VII or in any other part of this bill, that requires or authorizes any Federal agency or Federal court to require preferential treatment for any individual or any group for the purpose of achieving racial balance." [26]

It was similarly reiterated in further chapters of the legislative history that "The proponents of this bill have carefully stated on numerous occasions that title VII does not require an employer to achieve any sort of racial balance in his work force by giving preferential treatment to any individual or group" [27] and that "The title does not provide that any preferential treatment in employment could be given to Negroes or to any other persons or groups. It does not provide that any quota systems may be established to maintain racial balance in employment. In fact, the title would prohibit preferential treatment for any particular group." [28]

■■■ Therefore, in the light of this legislative history, it is difficult indeed to escape the conclusion that in seeking the abolition of departmental seniority and the creation of the unrestricted plant-wide seniority and bidding plan for the stated purpose of compensation for the years prior to 1962 and to achieve a racial balance, the Attorney General is asking the court not only to disregard the facts of the case but further to decree, not remedial relief, but the preferential treatment and racial balance which the principal sponsors of the legislation carefully explained was not the way the title was to be construed.

10. There is another aspect of the matter which should be discussed for complete analysis. Speaking through the then Chief Judge Hutcheson and Judges

Rives and Wisdom, the Court of Appeals for this Circuit has pointed out that "fairness is not achieved by treating the white incumbents unfairly." [29] and this, as Judge Lynne has observed, "should remain a polestar to guide the courts through yet uncharted seas." [30]

■■■ The plant-wide transfer and bidding program which the Attorney General has proposed would have elements of unfairness to the white employees who, having worked their way up to their positions in the lines of progression, would be subject to being in effect frozen there while employees from other departments bid in for the jobs above them in the progression lines. The Attorney General impliedly agrees that this will be the result of the plan he proposes but says that it is justifiable unfairness necessary to compensate the Negro employees for the past.

However, the Attorney General has said nothing regarding the effect that the proposed transfer and bidding plan would have on the Negro employees who have taken advantage of the opportunities to advance into the higher rated jobs and to transfer between departments. This point cannot properly be disregarded, for unlike the situation which would be presented if there had been no significant progression or transfer opportunities, the facts of this case are that there have been a substantial number of Negro employees who have progressed into the higher rated jobs and who have transferred and who would be in the identical position of having worked their way up to jobs in the lines of progression and then being frozen there while employees from other departments bid in for the jobs above them under

26. Justice Department Memorandum on Title VII. 110 Cong. Record 7207 (April 8, 1964); Legislative History, pp. 3244–3245; BNA, pp. 326–327.

27. Explanation by Senator Humphrey of the provisions of the Dirksen compromise. 110 Cong. Record 12723 (June 4, 1964); Legislative History, p. 3005; BNA, p. 302.

28. Concise Explanation of the Civil Rights Act of 1964. 110 Cong. Record 15866 (July 2, 1964).

29. Whitfield v. United Steelworkers of America, 263 F.2d 546, 550–551 (5th Cir. 1959), cert. denied, 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959).

30. United States v. Hayes International Corp., 295 F.Supp. 803 (N.D.Ala.1968).

the plant-wide transfer and bidding plan proposed by the plaintiff.

■ Therefore, given the factual circumstances of this case, the plant-wide transfer and bidding program which the plaintiff seeks would result in unfairness, not only to white employees, but as well to Negro employees who have taken advantage of the progression and transfer rights available to them. That, in the court's opinion, is a result which is neither required nor proper on the facts of this case.

■ 11. The court has further considered the evidence regarding the administration of transfer requests by the Company and can find no evidence of discrimination. Indeed, the only evidence of possible discrimination in the administration of transfer requests consisted of cases in which the complaint was that the Company had given Negro employees preference over white employees in the handling of transfer requests.

■ 12. There remains one further matter on the subject of transfers. During the course of the trial, one of the plaintiff's attorneys remarked that the Company had been making transfers rapidly in preparation for the case. The point has not been mentioned in the Attorney General's post-trial brief, but since the remark is on the record, it should be analyzed, for if the charge were substantiated, a different light might well be cast on the subject of transfers.[31]

The court has to say, however, that there is no evidence which lends substance to the charge and that it was most likely attributable to the heat of trial advocacy.

It may be reasonably assumed that the remark had reference to the Negro employees who transferred during the period between the time the suit was filed and the time it was tried. If these had been the only transfers of Negro employees since 1962, that would be one thing, but the fact is that there have been transfers of Negro employees throughout the years since 1962. Specifically, the transfers during the time the suit was pending were to the Brickmason, Cold Draw, Electrical, Mill Rolling, Mechanical, and Switch Yard departments, and the evidence shows that Negro employees had transferred into these departments prior to the time the suit was filed.

To analyze the matter in more detail, it appears that there were more transfers of Negro employees into the Mill Rolling and Electrical departments during the pendency of this suit than there were before the suit was filed. However, the evidence will not support an inference that this was attributable to the filing of the suit.

The basic point is the fact that transfers are initiated by the request of employees and not by the action of the Company. Therefore, the number of transfers which are made to any given department during any given period of time is governed in the first instance by the number of employees who have requested transfers to that department at the time in question.

On this point, the evidence shows that the employees who transferred to the Mill Rolling and Electrical departments during the period the case was pending had for the most part not applied for transfers until after the case had been filed. There were eight Negro employees who transferred to the Electrical department while the case was pending, and five of them applied for transfer after the case had been filed. Similarly, there were five Negro employees who transferred to the Mill Rolling department while the case was pending, and all of them applied for transfer after the case had been filed.

■ Moreover, the court is satisfied that the officials of the Company and the Union have been genuinely interested in promoting the transfer of Negro

---

31. Compare Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968).

employees. This is in part an intangible impression based on having heard and observed them on the stand, but it is as well based on objective factors, such as the adoption of the transfer privileges section and the Company's retesting of Negro employees to qualify them for transfer to the departments requested by them.

E. Aptitude tests:

1. The use of aptitude tests by this Company goes back to 1953, when Personnel Director Norman Wagner was instructed by the Company to attempt to upgrade the quality of the work force and obtain employees who would have the potential ability to advance to the highest jobs in the departments without freezing or becoming disqualified along the way.

At that time, employees were hired through the State Employment Service, which then—as now—administered the General Aptitude Test Battery developed and published by the United States Employment Service (referred to in the trial and here as the "USES test").[32] Therefore, to obtain an evaluation of the value of aptitude tests, the Company had the State Employment Service refer applicants who had taken the USES test during the two year period from 1953 to 1955. The performance on the job of the employees who had been tested was then reviewed by Personnel Director Wagner in the light of their scores on the aptitude test.

Based on the results of this evaluation, the Company concluded that the use of aptitude tests would be productive of a higher quality employee complement. It accordingly established the policy in 1955 that white applicants for employment would take the USES test administered by the State Employment Service, and the USES test was thereafter used during the period from 1955 to 1962.

This policy, as adopted in 1955, was not applied to Negro applicants. There-

fore, while the white employees hired during the period from 1955 to 1962 were required to have taken the USES test, the Negro employees hired during that period of time were not tested.

2. The integration of the lines of progression in 1962 created the situation of there being on the one hand the group of white employees who had been aptitude tested and on the other hand the Negro employees who had not been tested. Faced with this situation, the Company's initial decision—which remained in effect for ten months—was that because the white employees hired since the institution of the testing program had been aptitude tested, the Negro employees who had been hired during that same period of time should likewise take the test to determine their qualifications to advance on a permanent basis in the integrated progression lines.

This policy was applicable only to advancement by means of permanent assignments and was not applicable to advancement by means of temporary stepups. Therefore, all of the Negro employees were eligible to and did advance on temporary assignments without regard to aptitude tests during the period of ten months that this policy was in existence.

There has been some contention by the Attorney General that this policy was not limited to the Negro employees who had been hired during the period of time that white employees were required to take the aptitude test and that all of the Negro employees were required in 1962 to be aptitude tested to advance on permanent assignments. However, based on the evidence, including the testimony of one of the Attorney General's witnesses that he was not required to take the test to advance because he had been hired in 1950, it is the finding of the court that this policy adopted in 1962 was in fact applicable only to such of the then incumbent Negro employees as

---

32. As was shown by the manual for the USES test which was introduced in evidence, the United States Employment Service is an agency of the Department of Labor.

had been hired during the period of time that the white employees had been taking the aptitude test.

3. This policy was revoked by the Company in August of 1963 after having been in effect for ten months. Acting on the belief that the policy had seemed fair on the surface when initiated as the means of obtaining a parallel situation between the white employees who had been tested and the Negro employees who had not been tested but that it was subject to suspicion on the part of the Negro employees, Vice-President Blake concluded that the policy was a mistake and revoked it at that time.

The court finds that this decision was carried out and that since August of 1963, all of the Negro employees who were integrated into the progression lines in 1962 have been eligible to advance on a permanent as well as a temporary basis without regard to the aptitude test and that they have been and are in fact doing so.

4. (a) The USES test measures the following aptitude factors, which are usually referred to by the applicable letter prefix:

G (General intelligence)
V (Verbal aptitude)
N (Numerical aptitude)
S (Spatial aptitude)
P (Form perception)
Q (Clerical aptitude)
K (Motor coordination)
F (Finger dextrity)
M (Manual dextrity)

(b) The factors which are considered by this Company for hiring purposes are G (general intelligence), K (motor coordination), M (manual dextrity), and N (numerical aptitude).

The factors which are applicable for purposes of transferring into a department are based on the particular abilities and skills required for the work of that department.

There was no argument or evidence that the aptitude factors applicable for purposes of hiring and for purposes of transferring into departments are not related to the duties of the jobs in the plant and in the particular departments. On the contrary, from the evidence which was presented on the point, the court finds that the aptitude factors which are applicable are based on the abilities required in the performance of the jobs in the plant and within the departments. For example, the aptitude factors applicable to the Cold Draw department were and are G (general intelligence), K (motor coordination), M (manual dextrity), and N (numerical), with the other factors not being considered.

5. During the period of time from 1955 to 1962 that the USES test was being used, the State Employment Service furnished the Company with the scores on each of the aptitude factors. By thus having the score for each factor, the Company was able to evaluate the degree of ability and potential for advancement in terms of the job requirements of each department.

The Company was then advised by the State Employment Service in 1962 that because of a change in policy, it could no longer furnish the scores but could only advise whether the person taking the test had passed or failed. The effect of this change in policy was that the Company was no longer able to evaluate the degree of ability and aptitude, and, upon receiving this advice from the State Employment Service, the Company concluded that it could no longer use the USES test.

Based on the evidence showing that the aptitude and ability requirements differ from department to department, the court finds that the Company reasonably concluded that having the aptitude factor scores was necessary to evaluate the degree of potential ability in terms of the particular requirements of each department and that it was for this reason that the Company stopped using the USES test in 1962.

6. The Company thereupon attempted to obtain another aptitude test battery which would be comparable to the USES

test. For this purpose, Personnel Director Wagner reviewed the USES test and the tests available from testing concerns and, based on this review, selected as the most equivalent to the USES test a battery of tests published by Science Research Associates (referred to in the trial and here as the "SRA test").

The SRA test was thereafter used during the period from 1962 to early 1968.

7. Following the institution of the SRA test in 1962, the equivalency of the USES test and the SRA test was measured by the Company by comparing the scores of employees who had taken both of the tests. From this comparison, it was determined by Personnel Director Wagner that the use of a 12th grade norm on two of the factors, as had been the case with the USES test, resulted in lower scores on the SRA test, and he therefore lowered the norm on these factors to a 10th grade norm to produce scores equivalent to the scores on the USES test.

8. The SRA test which was used during the period from 1962 to 1968 was reviewed on two occasions for the purpose of determining that it was not racially discriminatory and was equivalent to the USES test.

(a) The first review was conducted in 1963 by Dr. James Tanner, an industrial psychologist in Birmingham. He testified that he was contacted by the Company and asked to review the SRA test and that he reviewed the testing program to satisfy himself that it was appropriate for the tasks for which it was being used and that it did not discriminate on any basis other than ability. Based on this review, he advised the Company that he found the test to be valid but that "In your zeal to be fair and non-discriminating you have perhaps lowered your test standards too much."

(b) The second review of the SRA test was conducted in 1964 under the auspices of Dr. Brimm of the Equal Employment Opportunity Office.

It was the purpose of this review to obtain the opinion of psychology professors, including one from an institution having a predominately Negro enrollment, with regard to the equivalency of the SRA test and the USES test. For this purpose, Dr. Brimm arranged for the test to be reviewed by Dr. Randolph Sailer, who was head of the psychology department at Miles College, and by Dr. Robert Hites of Birmingham-Southern College. Dr. Sailer and Dr. Hites accordingly reviewed the tests and reported their opinions to Dr. Brimm. The Company was in turn advised by Dr. Brimm in April of 1964 that "These two (2) professional psychologists have indicated to this office in written statements that the battery of tests now used by the H. K. Porter Company 'measures the same factors as those measured by the United States Employment Service' tests."

9. While Personnel Director Wagner and the Company's attorney were at the State Employment Service in early 1968, they were advised that there had been another change of policy and that the scores on the aptitude factors of the USES test could once again be furnished. Acting on this advice, the Company thereupon returned in early 1968 to the use of the USES test administered by the State Employment Service.

Therefore, to summarize in chronological order, the USES test was used from 1955 to 1962, the SRA test was used from 1962 to 1968, and the USES test is now again being used.

There has been some suggestion by the Attorney General that this return to the USES test in early 1968 was motivated by an attempt to "build a defense" for this case. However, having observed Personnel Director Wagner in testifying on the point, the court is fully satisfied that the Company resumed the use of the USES test because of the fact that the State Employment Service advised it could again furnish the scores on the aptitude factors.

■ 10. Before the trial opened, it was the Attorney General's position that the only issue in the case regarding aptitude tests was whether there was any difference as between Negro and white applicants or employees in the tests used or in the minimum standards for employment and transfer.

On this point, the evidence conclusively established that there is no element of discrimination. The testimony showed that the identical aptitude tests and the identical minimum standards for hiring and for transfer are now and have since 1962 been in effect for both Negro and white applicants and employees and that there is and has been neither difference nor distinction as between Negro and white applicants and employees in the minimum standards, the aptitude tests used, the administration of the tests, or the grading of the tests. The court accordingly so finds.

11. During the trial of the case, the Attorney General raised additional allegations regarding aptitude tests. Since there was no motion for a continuance when these allegations were raised,[33] and in the interest of complete adjudication of the case, these allegations have been considered as if asserted before the trial.

■ It was first alleged that the SRA test which the Company had used from 1962 to 1968 was not a professionally developed ability test. However, the court finds from the evidence on this point, including the testimony of the Attorney General's expert witness Dr. Richard Barrett, that each of the tests comprising the SRA test battery used by the Company was developed by recognized professional psychologists and is a professionally developed ability test in the sense that it was prepared and developed by professional psychologists.

It was not contended that the USES test used by the Company from 1955 to 1962 and at the present is not a professionally developed ability test in this sense.

12. It was further alleged during the trial that an aptitude test cannot be regarded as a professionally developed ability test within the meaning of section 703(h) of the title unless and until it has been test validated. For this argument, the Attorney General places reliance on the Guidelines on Employment Testing Procedures issued by the Equal Employment Opportunity Commission, on the testimony of its witness Dr. Barrett, and on the report, entitled "Differential Selection Among Applicants from Different Socioeconomic or Ethnic Backgrounds", which was co-authored by Dr. Barrett under the sponsorship of the Ford Foundation.

A test validation, as described in the Commission's guidelines, is a "process from the determination of behavioral requirements of the job through careful job analysis, the selection and/or development of instruments to measure these critically important abilities, the administration of these instruments to applicants for the job or employees on the job, the identification or development of measures of effective job performance (the criteria), to the comparison of individual employee scores with their criterion performance."

There is, as Dr. Tanner remarked in testifying, "a lot of jargon" used by the psychology profession in this field. Phrased in practical terms, the procedure consists of determining the objectives for which an aptitude test is being used, analyzing the duties and requirements of the jobs, selecting objective criteria by which to measure the performance on the jobs of employees who have taken the test, and determining the degree of accuracy with which the test

---

**33.** The fact that there was no motion for a continuance spared the court the problem of passing on the propriety on the allegations having been injected in the middle of the trial. Compare In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968).

and test standards measure the skills and abilities required for the duties of the job.

It is perfectly obvious that entirely apart from racial considerations, a test validation would be a useful means of determining the extent to which an aptitude test is measuring the factors which it is designed to measure. (It is equally obvious that it might be a rather expensive procedure if conducted by professional psychologists, since Dr. Barrett testified that he spent several days in analyzing the duties of only one job as just one of the steps of a test validation).

The question, however, is not the usefulness of a test validation per se but rather whether Title VII should be construed, as urged by the Attorney General, as outlawing the use by the Company of aptitude tests because they have not been validated by a professional psychologist.

This argument is based on the theory that aptitude tests inherently discriminate against members of a culturally disadvantaged minority group. As articulated in one of the Attorney General's briefs, "it is well known that minority groups are not as 'test wise' as the majority." It follows, according to the argument, that although Negro and white applicants and employees take the identical aptitude test under the identical circumstances and although the identical standards are applicable to both, the Negro is at a disadvantage in relation to the white because the test may consist of questions oriented to the cultural and educational background of the white race.[34] A test validation is therefore required, according to the conclusion of the argument, to insure that the questions and standards are related to

and set in accordance with the duties of the jobs.

To illustrate the point of this theory, the Attorney General calls attention, through argument and through Dr. Barrett's testimony, to the so-called "chitling test." This test consists of questions supposedly oriented to the Negro race or to persons with a culturally or economically deprived background, takes its name from the question asking the length of time that chitlings should be cooked so they will be edible, and is designed to show that tests can discriminate against white applicants and employees in relation to Negro applicants and employees.

The court recognizes that one of the general propositions which the Attorney General is attempting to establish through the litigation of section 707 cases is the theory that aptitude tests may not lawfully be used unless they have been validated. On this point, it has been held by another court that Title VII cannot properly be interpreted as conditioning the use of professionally developed ability tests on their having been validated.[35] There is considerable legislative history for that answer to the question, such as the explanation set forth in the interpretative memorandum of Title VII, prepared by its co-floor managers, that "There is no requirement in Title VII that employers abandon bona fide qualification tests where, because of differences in background and education, members of some groups are able to perform better on these tests than members of other groups."[36]

Nevertheless, this court would not say, as an absolute and categorical proposition, that Title VII could in no case and under no circumstances be construed as requiring the validation of an aptitude

---

34. It might be noted, however, that there was no argument or evidence that the SRA or the USES tests include such questions.

35. Griggs v. Duke Power Co., 292 F.Supp. 243 (M.D.N.C.1968).

36. Interpretative Memorandum of Title VII of H.R. 7152 submitted jointly by Senator Joseph S. Clark and Senator Clifford P. Case, Floor Managers. 110 Cong. Record 7212, 7213 (April 8, 1964); Legislative History, p. 3043; BNA, p. 329.

test. It is quite conceivable there might be such a case.

However, as applied to the factual circumstances of this case, there are several difficulties with the Attorney General's argument:

(a) If it is assumed for purposes of analysis that Title VII should be construed as requiring test validation, the facts of this case would satisfy such a requirement.

Neither the Commission's guidelines nor the "Standards for Educational and Psychological Tests and Manuals" adopted by the Commission have taken the position that test validations must necessarily be performed by professional psychologists. It would without doubt be preferable to have test validations conducted by professional psychologists, just as it would be preferable to have contracts prepared by attorneys and medical services performed by physicians. But it would require an extraordinary degree of self-delusion to deny that there are some laymen who are also qualified to perform those functions. By the same token, it would require the plainest statutory terms or legislative history before it should be said that the Congress has enacted a law providing that professionally developed aptitude test may be used, but only on the condition and at the expense of having been validated by professional psychologists.

If this statute is to be construed as requiring test validation, the important aspect of the matter is not to be able to say that it has been conducted by a professional psychologist but to be satisfied that it has been conducted fairly and properly. Moreover, the court received the firm impression from hearing the witnesses testify on the subject that because familiarity with the duties of jobs and with the job performance of employees are essential elements in a test validation, a layman having this knowledge and some experience in testing would be qualified to conduct a test validation.

This is certainly not to say that as a principle of general application, a layman would be qualified in every case to conduct a test validation. But this case is one in which it may and should properly be found from the evidence that this Company's personnel director has the requisite qualifications and that while he has not conducted a test validation as such, he has taken the steps which comprise the basic elements of a validation. The evidence shows that he has been in the personnel department since 1951, that one of the subjects in which he majored in college was psychology, that he observed the duties of the jobs for purposes of test analysis, and that he determined and studied the performance on the job of employees who had been tested in light of their test scores.

There is this further fact as well: When Dr. Sailer of Miles College wrote the Equal Employment Opportunity Office in 1964 regarding the review which he and Dr. Hites of Birmingham-Southern College had conducted of the SRA test, he stated that "I have full confidence in Mr. Wagner's integrity". From having observed Mr. Wagner during the many hours that he was on the witness stand testifying in this case, the court shares Dr. Sailer's evaluation and is convinced of Mr. Wagner's integrity in using fair and non-discriminatory aptitude tests and in setting standards reasonably related to the requirements of the jobs.

The court accordingly finds that if it is assumed for analysis purposes that Title VII conditions the use of aptitude tests on their having been validated, the essential steps of a validation, consisting of relating the tests to the requirements of the jobs, have been taken in this case.

(b) The courts must decide the cases which come before them on the evidence and not on abstract propositions. For a court to find racial discrimination in the use of aptitude tests

which have not been validated, there should be at least some evidence that the use of an aptitude test which has not been validated has resulted in discrimination and not merely the abstract proposition that test validation is desirable.

The only such evidence in this case consists of the deposition testimony of Assistant Personnel Director James Harris that during the period of time he gave the SRA test for pre-employment purposes, approximately 20% of the white applicants and 10 or 15% of the Negro applicants passed. However, a reading of the deposition shows that this period of time during which he gave the test was the several months from August of 1967 until the Company returned to the USES test in early 1968. Moreover, there was no evidence in the deposition or at the trial from which it might be inferred that these percentage approximations would be typical of the test results during a more representative period of time than the several months in question. It may be that they would be typical, but the court is not prepared on the record in this case to base a finding of fact on such speculation. It would be more accurate to say on the record here, as the plaintiff's attorney said during the trial, that there is no set pattern to the performance of Negro employees on the aptitude test, in that some scored higher and some scored lower.

Moreover, entirely apart from that aspect of the matter, the court would have to disregard the Attorney General's own evidence to find discrimination from a difference in test results alone. The basic premises, as stated in the Ford Foundation study which Dr. Barrett co-authorized, are that "differences in test scores do not indicate anything regarding the fairness of the tests" and that "a test may be considered to be unfairly discriminatory against members of a minority group only if the minority group members obtain significantly lower test scores than non-minority applicants and the minority applicants would

in fact be as successful [on the job] as the non-minority applicants."

The point, as amplified through the testimony, is that differences in test results may be attributable to differences in the aptitudes and capabilities of the persons taking the test and that such differences do not mean the test is discriminatory or unrelated to the requirements of the jobs. It may mean instead that the test is fulfilling the intended purpose of selecting the applicants who have the required aptitudes for the jobs which they will be performing in the plant or in a specific department of the plant.

This was illustrated by the hypothetical example posed to Dr. Barrett of five Negro and five white applicants taking the test for purposes of transfer to the Brickmason department, with the result that the five Negro applicants fail and the five white applicants pass. According to Dr. Barrett's testimony, this result would mean nothing more than the fact that five white applicants passed and five Negro applicants failed. Before it could be concluded that the test discriminated on the basis of race rather than on the basis of ability, there would have to be something to show that the five Negro applicants who failed had the capabilities for an equal probability of successfully performing the requirements of the jobs in the department in question. In the words of one of the authorities quoted in the Ford Foundation study, "discrimination is not unfair if people who are less likely to do well on the job are less likely to be hired."

The point was similarly expressed by Dr. Barrett when asked whether a test on which Negroes scored lower than whites could be used without discrimination against the Negro. Answering this question, Dr. Barrett testified that if the performance of the Negroes on the job was not equal to that of the whites, the test could be valid and fair because the objective is to predict performance on the job.

██ Therefore, applying these principles to this case, the fact there were

some 5–10% more Negro applicants than white applicants who failed the SRA test during a period of several months could not properly be taken as showing that the test is discriminatory or not related to the job requirements or that the standards are too high. This fact may actually mean that the test was fulfilling the intended purpose of selecting the applicants having the required aptitudes for the satisfactory performance of the jobs in this steel mill.

Moreover, there is neither allegation nor evidence that any Negro employee has been denied a transfer because of the departmental standards being set too high or being unrelated to the duties required to perform the jobs in the departments. The evidence further shows that some 33 of the Negro employees who have applied for transfers during the period since 1962 have not met the aptitude test standards of the departments to which they requested transfer, but it shows as well that some 58 of the white employees who have requested transfers have likewise failed to meet the aptitude test standards of the departments to which they requested transfer.

■ (c) The thesis of the Commission's guidelines is that "The Commission interprets 'professionally developed ability test' to mean a test which fairly measures the knowledge or skills required by the particular job or class of jobs which the applicant seeks, or which fairly affords the employer a chance to measure the applicant's ability to perform a particular job or class of jobs." Accepting this interpretation for purposes of analysis, and applying it to the record in this case, the result is that there is not sufficient evidence here from which it could be properly said that the SRA and the USES tests used by the Company do not fairly measure the knowledge or skills required by the jobs.

The court agrees in principle with the proposition that the aptitudes which are measured by a test should be relevant to the aptitudes which are involved in the performance of jobs, and it is not difficult to conceive of cases where the factors which are used here would be irrelevant. For example, in a case where the jobs in a plant are unskilled or semiskilled, such factors as spatial aptitude and numerical aptitude might well be found to be irrelevant.

■ But in this case, the court has found from the evidence that the aptitude factors which are applicable for purposes of hiring and for purposes of transfers to departments are related to the abilities required for the performance of the jobs.

To elaborate on this point, the only evidence to the contrary consisted of the testimony of one of the Negro employees in the Mill Rolling department that he is working the job of Roll Changer Grade III in that department and that in doing so he is not required to read instructions or use mathematics. Although there has been no argument or discussion in the Attorney General's briefs regarding the matter, the court has posed to itself the question of whether, in light of this testimony, the standards for the Rolling department properly include the G (general intelligence) and N (numerical aptitude) factors.

■ The court finds that it could not reasonably answer this question in the negative. The employee in question had been in the Rolling department for only six months at the time of the trial, the Roll Changer Grade III is the entry job in the line of progression of the Rolling department, and the fact that the reading of instructions and the use of mathematics are not required in this job is hardly evidence that they are not required in the higher rated jobs in the department.

On the other hand, there is the evidence which shows that the aptitudes which are measured are relevant to the jobs in the plant and in the departments and that where they are not relevant, they are not used. For example, there are no jobs in the Brickmason department or in the Switch Yard department which involve numerical computations,

and the N (numerical) factor is therefore not applicable for transfer to those departments.

Similarly, to apply the approach of a validation study of determining the performance on the job of employees who have been tested, the evidence provides the illustration on this point of two employees in the same department who had taken the SRA test, with the result that the employee who failed the test thereafter failed to perform the jobs in the department satisfactorily while the employee who passed the test thereafter satisfactorily performed each job in the line of progression and has advanced to the higher rated jobs in the department.

 On the record in this case, the sum and substance of the matter is that the plaintiff would have the court enter a finding of racial discrimination on the basis, without more, of the hypothetical proposition that the use of aptitude tests without validation necessarily equals discrimination, and this the court cannot properly do.

(d) The overall conclusion reached by the Ford Foundation study co-authored by Dr. Barrett was that "tests should be validated separately for each ethnic group" and that "either different standards of selection or different selection instruments should be used with different ethnic groups in most instances." [37]

This conclusion, as developed through the testimony, was that the "different selection instruments" means the use of one test for Negroes and another test for whites and that the "different standards of selection" means the use of lower standards for Negroes than for whites.

The Attorney General has likewise urged this proposition on the court in the argument that "with the general understanding that Negroes do not score as well as whites on tests, to use unvalidated tests and require the same scores of Negroes and whites will necessarily discriminate against Negroes."

 However, it is obvious enough that the use of different tests or different standards for Negroes and whites would itself constitute prohibited discrimination. Recognizing that this might be true, it was Dr. Barrett's recommendation that "the laws should be changed." This may ultimately be the answer, but it will have to be the Congress and not the courts which change the law to reach this result.

13. There was no allegation or argument in this case with regard to the Company's hiring procedures, and there was accordingly no attack on the use of aptitude tests for hiring purposes.

The use of aptitude tests for transfer purposes was attacked by allegations raised during the course of the trial, and the court will now discuss the arguments and the evidence on this subject.

The background facts are as follows: If an employee who applies for transfer from the Labor Pool to a department or from one department to another has previously taken either the SRA or the USES test and has scores which meet the minimum standards of the department to which the transfer is sought, he is eligible for transfer without more. If he has not previously taken the SRA or USES test or has taken one of the tests but has less than the minimum standards of the department to which the transfer is sought, he will be retested on such of the factors as are required and will be eligible for transfer upon meeting the minimum standards by means of the retest. For example, a score of 80 on the K (motor coordination) factor is the minimum standard for hiring purposes and for transfer to all of the departments except the Rolling department, which requires a higher degree of coordination in the performance of the jobs and has a standard of 90 on the K factor. There-

---

37. Although this was the final report to the Ford Foundation, Dr. Barrett testified that he was not certain that it should have used the term "most" and that "some" might have been more accurate in light of the present state of knowledge and information on the subject.

fore, if an employee has been hired with a score of 80 on the K factor, he will be retested on that factor if he applies for transfer to the Rolling department, while if he scored 90 or more on the K factor when he was tested for hiring purposes, no retest is given.

Since the Company is now using the USES test, the employees who are retested for transfer purposes take the USES test at the State Employment Service. This is illustrated by the testimony of one of the Negro employees that he was tested at the State Employment Service when he requested (and received) a transfer to the Mill Rolling department in 1968.

There is no question about the fact that this procedure is applicable to and is followed with respect to both Negro and white employees alike and that there is no difference as between Negro and white employees in the test used or in the minimum standards of the departments. There is no argument to the contrary, but as one of the steps of the unrestricted transfer and bidding program which the Attorney General seeks, it is argued that the use of aptitude tests for transfer purposes is discriminatory and should be eliminated. The court will therefore analyze the points relied on by the Attorney General for this result and the evidence relating to each:

(a) The principal point relied on by the Attorney General is the contention that incumbent employees stand on a different footing than applicants on the street and should not be required to meet aptitude test standards in order to transfer from one department to another.

The premise of this argument is certainly true enough. Furthermore, the court might agree as well with the conclusion in a case where the departmental structure is artificial or unrelated to the actual functions of the jobs in the departments or where there are no appreciable differences in the skills and abilities required from one department to another.

But that is not this case. From the evidence in this case, the court has found that the departmental lines here are not artificial but are based upon the distinctive type of work performed by each department and that there are substantial and significant differences between the departments in the skills and abilities required.

For example, having heard the witnesses explain the functions of jobs in the Rolling department in conjunction with the graphic illustrations of the testimony provided by photographs of the jobs, there is no doubt in the court's mind that the Rolling department requires a higher degree of motor coordination and manual dexterity than is required by other departments because of the intricacy of the functions performed by the jobs in that department in the rolling of steel. Another example is the fact that some of the departments require spatial ability, as is illustrated by the obvious importance of this aptitude in the employees who operate the overhead cranes, while for departments which have no jobs requiring this aptitude, the S factor is not relevant and therefore is not applicable.

The point is further illustrated by the evidence applicable to the Attorney General's argument that the K (motor coordination) factor should not be relevant for transfer purposes because, according to the argument, the Company should be able to tell from having observed the job performance of an employee whether or not he has enough coordination to perform the jobs in the department to which transfer is requested. This argument would have merit in a case where the evidence shows that there is no appreciable difference between jobs in different departments with respect to the degree of coordination required. But that is not the showing of the evidence in this case. An employee who has been working as a Bundler, for instance, needs only the degree of coordination necessary to place bars in a pile for bundling, and it could not be rea-

sonably said that this would show the degree of coordination required to perform such jobs as operating the overhead cranes or operating the rolling mill equipment.

■ There may well be cases brought under Title VII in which, after having heard the evidence, the finder of fact may rightfully say that satisfactory job performance in one department is enough to show potential ability for satisfactory job performance in another department. But that cannot be said on the evidentiary record in this case. Instead, based on the facts of this case, the court must find that satisfactory job performance in one department is not enough to justify an inference that the employee has the requisite skills and abilities for satisfactory job performance in another department.

■ (b) It is further argued that it should be enough for the Company to rely on the opinions and recommendations of employees' supervisors in determining their ability to perform the jobs in the department to which transfer is requested.

The court is not at all convinced to begin with that it would be the preferable procedure in any case and under any circumstances to rely on the subjective opinion of a supervisor as opposed to the objective standard which is provided by an aptitude test. It was Dr. Tanner's observation in testifying that no aptitude test is a perfect means of employee selection but that because of the objective standard which it provides, the company which uses aptitude tests is less likely to discriminate than is the company which uses subjective opinions as the means of selection rather than aptitude tests and that "you just can't imagine the many kinds of injustice when you don't have some kind of objective procedure."

This impresses the court as an accurate and reasonable view, and to apply that thought to the Attorney General's argument here, it is at the least conceivable that the idea of basing transfer requests on subjective evaluations of ability by supervisors could lend itself to discriminatory results. The court has observed Personnel Director Wagner on the stand and is convinced that he would be fair in the rendering of subjective evaluations of employee ability, but the court obviously could not have observed all of the supervisors on the stand and cannot say that the Attorney General's proposal to base transfer requests on their subjective evaluations would be the proper approach to the matter.[38]

Moreover, entirely aside from this doubt concerning the desirability of basing transfers on the recommendations of supervisors, the argument is not applicable to the facts of this case because the Company no longer has any discretion to reject a transfer request on the judgment of management or supervisors that the employee is not qualified. Before the transfer privileges section was adopted in 1965, the Company had the discretion to deny transfer requests on grounds such as the applicant not being recommended by supervision or the applicant's attitude or productivity, and the evidence shows several cases prior to 1965 of requests for transfer by employees (who were white) being denied on the ground that they were not recommended for transfer by supervisors. However, this discretion no longer exists, because the transfer privileges section gives an employee the absolute right to be transferred according to seniority to openings in departments upon meeting the minimum aptitude standards.

It therefore cannot be said here that the Company should rely on the recommendations of supervisors, for even if

---

38. A similar opinion was expressed by the court in the *Dobbins* case with regard to union referral systems being based on the subjective evaluation of a union business agent and not on objective criteria. In the court's words, "the referral system is applied arbitrarily at the particular whim of the business agent * * * The referral system as presently written is in fact deficient and constitutes a dangerous potential in the discrimination field."

an employee is not recommended for transfer by supervision, he nevertheless has the right under the transfer privileges section to be transferred upon meeting the minimum aptitude standards. The requirement of meeting the minimum aptitude standards is accordingly the only means that the Company has to measure ability to perform the work of the department to which transfer is requested.

■ (c) The fact that the Company has no discretion to deny the transfer applications of employees who meet the minimum aptitude standards is another reason that the *Philip Morris* case, relied on by the Attorney General, is not applicable to the facts of this case. There, as another court has pointed out, the company "exhibited no business purpose or reason for its transfer restrictions." [39] But the evidence in this case establishes that because of the provisions of the transfer privileges section adopted in 1965, the aptitude standards serve the legitimate purpose of providing the only means of determining the potential ability of employees to perform the requirements and duties of the jobs within the departments.

(d) Another of the arguments on this subject has been the allegation that the use of tests for transfer purposes was instituted to inhibit the transfer of Negro employees.

It was initially argued that the use of tests for transfer purposes was adopted in 1965. However, since there is no dispute with the evidence showing cases prior to 1965 of white employees whose requests for transfer were denied because they failed to meet the minimum aptitude standards of the departments to which they requested transfers, that argument could not be sustained.

It was then argued that while the aptitude test was required for hiring purposes since 1955, it was not used for transfer purposes until 1962 when the lines of progression were merged.

■ It is a reasonable assumption that there is more than one employer in this country which began using aptitude tests at the time that jobs were integrated or at the time that Title VII was enacted. However, that could hardly be said to constitute discrimination in and of itself, particularly in light of the amendment which was adopted in the Senate to authorize the non-discriminatory use of professionally developed ability tests.

■ Moreover, there is no dispute with the fact that this Company began using aptitude tests in 1955, and the Attorney General has pointed to no evidence substantiating the allegation that tests were not required for transfer purposes prior to 1962. The closest that the evidence came on the point was when the witnesses referred to the test requirement which was in effect during the period from 1955 to 1962 as "pre-employment testing", but it would require considerable conjecture to assume from this characterization that an employee who had been hired before 1955 could transfer between 1955 and 1962 without taking the aptitude test. Furthermore, there is on the other hand testimony that during the period from 1955 to 1962, the aptitude test was not only required for hiring purposes but was also required of employees who had already been hired, including an instance of an employee who "applied for employment on a permanent basis or for transfer to some other department."

(e) The remaining argument on this subject is not directed to the requested abolition of the use of tests for transfer purposes but is rather directed to the proposition that if their use for this purpose is proper, the standards should be set in accordance with the degree of the abilities required for the jobs at the bottom of the lines of progression only.

This argument is based on the theory that not every employee who enters a department will be able to hold the

39. Griggs v. Duke Power Co., 292 F.Supp. 243 (M.D.N.C.1968).

highest jobs in the departmental lines of progression. For example, it is pointed out that there are six employees who are holding the Roller job—which is the highest paying job in the plant—and that there is not room in the Roller job for every employee who enters the Rolling department.

To this argument, the Company replies that the use of aptitude tests has from the outset in 1953 been designed to measure ability to progress to the top and to eliminate the undesirable consequences of an employee voluntarily freezing or being disqualified on the way up and, with reference to the example of the Rolling department, that it would like to have the Negro employees who have in the past transferred and may hereafter transfer to that department go all the way up to Roller.

 However, it is not necessary to decide this question, because the matter has been satisfactorily resolved by the Company and the Union. It was brought out during the trial that in the then recently concluded negotiations in the basic steel industry in Pittsburgh, the steel companies and the unions had agreed on a new section of their contracts providing that tests used for transfer purposes shall be directed to measurement of the knowledge or ability required for the entry job and the next job above the entry job in the department to which transfer is sought. It was Dr. Tanner's opinion that this was a generally sound approach to the matter of transfers, and the court is in agreement with that opinion.

Thereafter, this provision which had been added to the basic steel contract was also agreed upon by this Company and Union and added to their contract, where it is set forth in the transfer privileges section. Under this amendment, therefore, the aptitude standards are set in accordance with the abilities required for the bottom two jobs only in the departmental lines of progression.

 The court should emphasize in ruling on this subject that the adoption of a contractual provision could never provide immunity against injunctive relief. However, it would not be appropriate to issue an injunction confirming the requirements of this provision adopted by the Company and the Union, because it is most doubtful that the court could have upheld the argument that the standards were improperly set before the adoption of this provision. There is something to be said for both sides of the matter, but there is more to be said for the proposition that given the fact the standards were identical for Negro and white employees, it was not unlawful for the Company to have measured potential ability to advance to the top of the progression lines without freezing or being disqualified on the way up.

In the first place, it was explained during the Senate's consideration of this legislation that "An employer may set his qualifications as high as he likes, he may test to determine which applicants have those qualifications, and he may hire, assign, and promote on the basis of test performance" [40] and that "The employer will outline the qualifications to be met for the job. The employer, not the Government, will establish the standards." [41]

In the second place, there is neither allegation nor evidence that any Negro employee was denied a transfer because of the departmental standards being set in accordance with the abilities required for the higher rated jobs.

 By way of summary, the court has found from the evidence that the skills and abilities required for the performance of jobs differ from department to department, that since employees have the absolute right under the transfer privileges section to be transferred to

40. Interpretative Memorandum of Title VII of H. R. 7152 submitted jointly by Senator Joseph S. Clark and Senator Clifford P. Case, Floor Managers, 110 Cong. Record 7213 (June 8, 1964); Legislative History, p. 3043; BNA, p. 329.

41. Senator Humphrey at 110 Cong. Record 13088 (June 9, 1964).

openings in departments in accordance with their seniority on meeting the aptitude standards and since the Company thus has no discretion to deny a transfer request on subjective grounds, the requirement of meeting the aptitude standards is the only means that is available to measure ability to perform the work of the department to which transfer is requested, and that this itself is now limited to the ability required for only the bottom two jobs in the departments. Therefore, based on these facts, the court finds that the use of aptitude tests for transfer purposes is reasonable in the factual circumstances of this case.

14. There is no allegation or evidence that the departmental aptitude standards have been any higher during the period since 1962 than they were during the period from 1955 to 1962. On the contrary, the court finds from the evidence on the point that the Company set the minimum aptitude standards in 1962 in accordance with the lowest scores made by any white employee in the department who was hired during the period from 1955 to 1962 and that there has been no change in these minimum standards as set in 1962.

15. In the interest of complete analysis, the court has reviewed the evidence regarding transfer requests which have been denied by reason of the departmental aptitude standards, although there is no allegation or argument on the point.

This evidence establishes that there has been no deviation from the requirement that applicants for transfer meet the minimum departmental standards. For example, in 1964, a Negro employee was transferred to the Electric Furnace department while a white employee was denied a transfer to that department because he was below the minimum aptitude standards; in 1966, three Negro employees were transferred to the Cold Draw department while two white employees were denied transfers to that department because they were below the minimum standards; in 1967, a Negro employee was transferred to the Electric

Furnace department while a white employee was denied a transfer to that department because he was below the minimum standards.

This is further illustrated by the evidence regarding two white employees who were placed in the Labor Pool when their department was closed. They both applied for transfers in 1966 to several departments, and although they had more than ten years seniority, their transfer requests were denied because they could not meet the aptitude standards of the departments to which they requested transfers.

■ The court accordingly finds from the evidence that there has in fact been no deviation from the requirement that employees requesting transfers meet the minimum standards of the department to which transfer is requested and that this requirement is applied equally to both Negro and white employees.

*F. Arithmetic tests for four jobs:*

1. This issue concerns arithmetic tests which the Company developed and used to measure the ability of employees to be trained for and to perform the arithmetical computations of the four jobs of Weighman in the Finishing department and Inspector, Assistant Foreman, and Yardman in the Mill Auxiliary department.

There is no contention that these arithmetic tests were used with respect to any jobs other than the four jobs in question.

■ 2. Since these arithmetic tests were developed by the Company, the court holds at the outset and without hesitation that they cannot be considered as professionally developed ability tests within the meaning of section 703(h) and that this provision of the statute can provide no protection for their use.

3. The tests themselves were not introduced into evidence. However, the testimony is in agreement that they consisted of several questions based on the type of arithmetic problems which are encountered in the day-to-day perform-

ance of these four jobs. In the words of one of the employees who testified for the Attorney General, they were "based on what you would do on the job, like multiplying, adding, subtracting, and dividing."

The evidence similarly establishes that the four jobs of Inspector, Assistant Foreman, and Yardman in the Mill Auxiliary department and Weighman in the Finishing department involve arithmetical computations in the performance of their duties. For example, a Negro employee who has worked the Weighman job in the Finishing department testified that the job involves such functions as figuring the weight of a bar from the weight per foot, then figuring the weight of the total number of bars needed to fill the customer order, and then telling the Bundler the number of bars to place in the bundle.

4. From the evidence on the point, the court finds that the circumstances leading to the use of these arithmetic tests were as follows:

Following the merger of the lines of progression, the Company began training and assigning Negro employees in late 1962 or early 1963 to the jobs of Weighman in the Finishing department and Inspector, Assistant Foreman, and Yardman in the Mill Auxiliary department without prior screening or selection to determine ability to be trained for the arithmetical computations of the jobs.[42]

This training consisted of placing the trainees on the jobs for periods of one and two weeks, during which they were paid the rate of the job they were regularly working.

According to the testimony for the Company, this initial procedure of training and assigning employees to the four jobs beginning in late 1962 or early 1963

without preliminary screening to determine their arithmetical ability produced the disappointing and abortive results of employees voluntarily giving up the jobs or not being able to perform the required arithmetical computations after having been trained. Thereafter, the Company developed and began using the arithmetic tests as the means of selecting the employees who had the potential to be trained for the arithmetical computations required in the performance of the jobs.

This evidence is not contradicted, and it is furthermore substantiated by the testimony of one of the plaintiff's witnesses that the Company trained him for the Inspector and Yardman jobs without requiring a test and that he thereafter voluntarily gave up both jobs.

The court is satisfied from the testimony heard at the trial that these arithmetic tests were adopted and used, not to inhibit or limit the advancement of Negro employees into the jobs, but rather for the purpose of screening to select the employees who could be successfully trained for the arithmetical computations of the jobs. Similarly, taking into consideration the background of the initial experience of attempting to train employees for these jobs without screening, and the fact that the training given by the Company involved a not inconsiderable time and expense, the court is of the opinion that the use of these arithmetic tests was not unreasonable under the circumstances which then existed and was at the time a legitimate means of selecting the employees who had the arithmetical ability to be trained for the jobs.[43]

5. It is argued by the Attorney General that the use of these tests was discriminatory in that they had not been required of white employees who had held the jobs prior to 1962.

---

42. One of the Attorney General's witnesses testified that the Company began training Negro employees in the Finishing department for the Weighman job "about the first part of 1963", and another of the Attorney General's witnesses testified that the Company trained him for the

Yardman job in the Mill Auxiliary department "back there in about 1962".

43. Compare Cooks v. Brotherhood of Railway Carmen, 50 Lab.Cas. ¶ 19,292 (S.D. Tex.1963), aff'd, 338 F.2d 59 (5th Cir. 1964), cert. denied, 380 U.S. 975, 85 S.Ct. 1336, 14 L.Ed.2d 270 (1965).

The court would be inclined to agree with the argument if the tests had been required initially of Negro employees and if the Company had not trained and assigned Negro employees to the jobs without using these tests. However, the evidence conclusively establishes that such was not the case and that the Company at first trained and assigned Negro employees to the jobs in 1962 and 1963 without the use of the tests and that the tests were thereafter developed as a screening procedure to determine ability to be trained.

6. The remaining argument on this subject is based on the fact that two white employees (Ed Collier and Charles Niven) transferred from the Labor Pool to the Mill Auxiliary department in 1966 and have been working the Inspector, Assistant Foreman, and Yardman jobs on temporary assignments without taking the arithmetic tests.

This is a circumstance which certainly calls for the most careful scrutiny, and the court has critically considered the evidence on the issue.

■ If the evidence had shown that Collier and Niven had been trained for or had worked these jobs at a time that incumbent Negro employees had not been afforded opportunities to be trained for them, the court would not hesitate in upholding the Attorney General's argument. The difficulty is that on the one hand, there was no such evidence and that on the other hand, the evidence is that they were trained for and assigned to the jobs only after all of the incumbent Negro employees had been surveyed, during the preceding three years since 1962, and had either trained for the jobs and were working them, or had declined offers of training, or had been unable to perform the jobs after training, or had voluntarily given up the jobs and, in sum total, that the Company had completely exhausted the department for employees to work the jobs. The court accordingly so finds.

■ The court further listened and searched carefully for evidence from which it might be inferred that they were not given the tests because of their race. But the difficulty is that there is no such evidence and that the reason established by the evidence is that the numerical factor of the aptitude test taken by Collier was sufficient and was relied on as demonstrating that he had the arithmetical ability for the jobs.[44]

The court would similarly agree with the Attorney General on this issue if the evidence had shown that Collier and Niven had displaced any Negro employees on these jobs. But here again, there is on the one hand neither allegation nor evidence to this effect and there is on the other hand the evidence which is not disputed and from which the court finds that the jobs have continued to be worked by Negro employees as well.

Moreover, the fact that these two white employees have worked the jobs without taking the arithmetic tests should properly be weighed in balance against the fact that at least three Negro employees in the Mill Auxiliary department have likewise been trained for and worked the jobs without taking the tests.

■ 7. To summarize this subject, the court finds from the evidence that the four jobs in question involve arithmetical computations in the performance of their duties, that the Company at first trained and assigned Negro employees to these four jobs without screening and thereafter developed the tests because of the results of the initial phase of training without prior screening, that the tests consisted of the type of problems encountered in the performance of the duties of these four jobs, and, based on these facts, that the use in the past of the tests was a legitimate means of se-

44. It is not clear from the evidence whether Niven was or was not given the screening test. However, to view the case in the light most favorable to the plaintiff, the court will assume that he was not given the test. As the evidence does not show whether he was given the test, it equally does not show the reason if such were the fact.

lecting the employees who had the arithmetical ability to be trained for these four jobs.

Therefore, the court has found on the evidence before it that the use in the past of the arithmetic screening tests was not discriminatory and could stop at this point without more. However, the court is not satisfied to do so.

It is one thing to have used these tests as a screening procedure to select the employees to be trained. That use, in the circumstances present at the time, has been found to have been reasonable and legitimate. But the court believes that if they continue to be used, there would be a potential ground for discrimination. To take one example which comes to mind, if the tests should be given to any Negro employee in the Mill Auxiliary department who has a score on the numerical factor of the USES or SRA aptitude test comparable to the scores of Collier and Niven, that would certainly constitute discrimination.

The record is not explicit on the question of whether these arithmetic screening tests will continue to be used. There was no testimony on this question at the trial, and the most which was established by the deposition testimony is that the tests had not been used for some time but would "probably" be in effect for an employee who had not made a satisfactory score on the N (numerical) factor of the pre-employment aptitude tests.

■■■ The court could not justifiably enjoin the use of these arithmetic tests in the future on the ground of speculation about potential discrimination. But the court may and will direct the Company to advise the court whether it will or will not use these tests again. If the answer is in the affirmative, then the court will take the matter under further consideration.

### G. Procedures for progression:

■■ There is no allegation of discrimination in the procedures by which employees advance in the lines of progression with respect to Negro employees who have entered departments since October of 1962. However, it is alleged that the Negro employees who were employed prior to October of 1962 and are in the same department as they were then are discriminated against in the procedures for progression.

1. This allegation is based on the theory that when the lines of progression were integrated in 1962, the Company and the Union allegedly "created a new standard of 'job seniority' for progression in place of the existing standard of departmental seniority."

The points which are established by the evidence regarding this allegation are as follows:

(a) The subject here at issue is the procedure that the first man to reach a job is in turn the first man to advance from there to the next job in the line of progression. To take the Electric Furnace department for purposes of example, the employee who first works the Ladle Helper job will be the first to advance to the Ladleman job, although he may have less departmental seniority than another employee who reached the Ladle Helper job after him. It is, in brief, a procedure of "first in-first out."

The evidence will not sustain the argument that this was a new procedure created in 1962. Instead, the witnesses for the Attorney General as well as for the defendants testified without hesitation and convincingly to the fact that in every situation, the first man to reach a job is the first man to advance to the next job, although another man may have more departmental seniority.

For one example, the Company and the Union entered into an agreement in 1960 which was known as the "roll change agreement" and which provided, inter alia, that employees working the jobs of Roll Changer Grade II and Grade III pursuant to the agreement would not gain seniority on other employees by reason of having done so. This agreement was revoked in 1965, and the employees who had been working these jobs were thereupon displaced by employees with more departmental seniority because of the fact that they had worked

the jobs under the agreement that they would not gain seniority rights by doing so. The result was that while they were the first men to reach those jobs, the operation of the normal procedure for progression was suspended as to them by reason of the provisions of the roll change agreement.

The procedure is further illustrated, as between white employees, in the merger and the creation of lines of progression having no connection with race, in that when the Painter and Carpenter jobs in the Carpenter Shop were merged and when the Switch Yard department was created, the employees who had first worked jobs higher in the lines of progression had job seniority over employees having more departmental or Company seniority.

(b) At the trial, the Attorney General introduced a substantial amount of evidence regarding the way that the Company and the Union resolved a dispute regarding rights to the job of Catcher in the Mill Auxiliary department after it was upgraded in 1965 to a higher wage rate.

The facts regarding this matter are that several employees had voluntarily frozen on the Catcher job before it was upgraded and that several other employees had accordingly obtained job seniority on them by advancing to the then higher rated jobs while they were frozen on the Catcher job. When the Catcher was upgraded, these employees who had obtained job seniority were scheduled on the job and displaced the senior employees who had frozen on it while it was a lower rated job. These displaced employees in turn filed grievances protesting their displacement, and the Company and the Union held a meeting to arrive at a resolution of the grievances. At this meeting, it was agreed in settlement of the grievances that "the employees should be scheduled on this job in accordance with their departmental seniority." The result was that the employees who had been working the job before it was upgraded were allowed to

stay on the job after it had been upgraded.

The point which the Attorney General was seeking to establish through this evidence has not been articulated in argument or in the briefs, but it may reasonably be assumed that the intended point was to show a case where a job was assigned to the employees with the most departmental seniority in preference to the employees with job seniority.

■ However, this agreement which was reached in settlement of the grievances is not proof of the precedence of departmental seniority over job seniority even as applied to the one situation in question. It is explained by the evidence that this grievance settlement was based on the proposition that the senior employees had elected to remain on the Catcher job before it was upgraded and that they should be allowed to remain with the job after it was upgraded, and this is not inconsistent with the procedure that the first man to a job is the first man to advance to the higher rated jobs, because at the time the junior employees obtained job seniority over the employees who elected to remain on the Catcher job, it was not then a higher rated job. This is accordingly the court's finding.

(c) The Attorney General places considerable reliance on the argument that since the Union contract contains no provision regarding job seniority and provides that promotions will be based on the factors of departmental seniority, physical fitness, and ability to perform the work, the application of this progression procedure "is in direct violation of the collective bargaining agreement."

The reliance which the Attorney General has placed on this argument would be more appropriate in a case where the evidence is not as conclusive as it is here that this procedure has always been in effect and has been applied in every context. Given the evidence in this case, the Attorney General's argument would have the court adopt a senseless triumph of form over substance. Moreover, the Un-

ion contract itself expressly provides for progression procedures which have been in effect but are not set forth verbatim in the contract.

(d) In a similar argument, the Attorney General has called attention to the fact that the seniority section of the Union contracts prior to 1965 contained a sentence stating that "An employee's seniority in his department shall be determined by his length of continuous service in that department" and that this sentence was omitted from the 1965 contract. Based on this fact, the Attorney General argues that the omission was deliberate and was the result of the alleged creation of the "new standard of job seniority."

Having observed and heard the testimony of the Company and Union representatives who negotiated the contract in 1965, the court is satisfied and finds that this omission was entirely inadvertent and that it resulted from the fact that because of the adoption of the transfer privileges section in 1965, the preceding sentence of the contract, which provided before 1965 that "No employee shall hold seniority in more than one department," was rewritten in 1965 to provide that employees who transfer under the transfer privileges section will hold seniority in more than one department.

(e) The only inconsistent item of evidence on this point consists of the fact that the president of the local Union is quoted in the minutes of a Company-Union meeting as having said that "No employee could gain squatters rights on any job." However, since this quoted remark was made in the course of the argument of a grievance, it is questionable that the statement should properly be read as more than a claim advanced in arguing the grievance, especially in light of the fact that the grievance in question was thereafter taken to arbitration and was denied by the arbitrator. Moreover, although the president of the local Union testified and was cross-examined by the Attorney General, he was not asked on cross-examination about the

meaning or the reference of this statement.

In sum total, based on the evidence and on observation of the witnesses in testifying on this point, it is the finding of the court that the argument that there was a new standard of job seniority created in connection with the merger of the progression lines to give preference to white employees is untenable on the facts of this case.

2. Although it is not a proposition argued by the Attorney General, the court is itself of the opinion that even though this was no more than an application of the uniform standard of progression, there must further be considered the question of whether it was applied in the merger of the lines of progression for the sole benefit of white employees.

The answer established by the evidence in this case is that it was not and that it was instead applied for the benefit of Negro employees as well.

The evidence shows that in the Electric Furnance department, there were some thirty-five Negro employees who were placed in the integrated line of progression in 1962 ahead of white employees and that the white employees have not been allowed to displace such Negro employees, although one of those white employees had greater departmental seniority than the Negro employees placed in the line of progression ahead of him. Instead, the Negro employees have been and are advancing in the line of progression ahead of the white employees.

Similarly, when the progression lines in the Fabricating department were integrated in 1962, the jobs of Bender Operator and Gauger, which were then held by Negro employees, were integrated in the progression line ahead of the job of Tagman, which was then held by white employees. The Negro employees in the Bender Operator-Gauger jobs therefore advanced to the then next higher rated job of Shear Leaderman ahead of the white employees. The result is that when there is a reduction in force in the Fabri-

cating department, a white employee who was in the Tagman job in 1962 is rolled back to the Labor Pool or works the lower rated Bundler job while Negro employees who had been in the Bender Operator-Gauger jobs in 1962 work the Shear Leaderman job.

3. It is the Attorney General's further position on this subject that only white employees benefit from the operation of the procedure that the first man to a job is the first to advance. But that argument could be sustained on the record in this case only by the impermissible procedure of considering part of the evidence and then disregarding all the rest of the testimony which the court has heard.

For example, the Attorney General relies on the fact that in the Finishing department, James Norman, a Negro employee having a 1961 seniority date, will advance from the Weighman job to the Straightner Operator job behind Charles Brewster, a white employee having a 1962 seniority date, and will continue to do so until Brewster voluntarily freezes or is disqualified or one or the other retires, quits, dies, or is discharged.

If this were the total of the evidence on the point, it would be said that the procedure operates for the exclusive benefit of white employees. But this is not the total of the evidence, and the courts cannot be expected to base their findings on bits and pieces of testimony. Instead, the evidence provides comparable examples of white employees with more departmental seniority who work behind Negro employees with less departmental seniority and who will continue to do so until the Negro employees voluntarily freeze or are disqualified or one or the other retires, quits, dies, or is discharged.

Therefore, based on the complete evidence in the case, the court must properly find that this procedure is not a racial standard but is instead a standard which operates for the benefit of the employee, Negro or white, who first reaches a job.

4. The Attorney General cites the *Crown Zellerbach* case as controlling authority on this allegation.[45] However, for the reasons which have been expressed at the outset, the court cannot accept this mechanistic approach. It may well be that the *Crown Zellerbach* case reached the precisely proper result in the context of the facts which were there presented to the court, but as Judge Heebe pointed out in his opinion in the case, he found that "job seniority is certainly not inherently prejudicial to Negroes" and that the seniority system there at issue was discriminatory "In the circumstances of this case".

The determinative point is that in the circumstances of this case, the facts as found by the court from the evidence here presented comprise a factual setting which will not sustain the theory urged by the Attorney General.

Moreover, there is another fact which the court cannot disregard in this analysis. In *Crown Zellerbach*, the court's initial finding of fact was that the defendants had "actively engaged, prior to January 1966, in a pervasive pattern of discrimination against the Negro employees". Therefore, as Chief Judge Lynne has pointed out, the conclusions reached in the *Crown Zellerbach* case emanated from this initial and basic finding of fact.[46] In this case, in contrast, the facts as found by the court are that the Negro employees have been advancing in the integrated lines of progression since October of 1962 and that the positions to which Negro employees have today advanced are the result of the fact that they have been advancing in the lines of progression since that time.

45. United States v. Local 189, United Papermakers & Paperworkers, 282 F.Supp. 39 (E.D.La.1968); Hicks v. Crown Zellerbach Corp., (E.D.La.1968).

46. United States v. Hayes International Corp., 295 F.Supp. 803 (N.D.Ala.1968).

5. To reach the result sought by the Attorney General, the court would have to disregard still another fact which is present in this case.

The procedure that the first man to reach a job is the first to progress to the next job provides employees with the longest period of time of learning the duties and responsibilities of each job before progressing to the next job. This would not be material in a case where by working a job, an employee would not acquire any meaningful knowledge of the next job. In such a case, it could be said that an employee could work one day on a job and be ready to move to the next job.

In this case, however, the evidence shows and the court has found that the jobs in the lines of progression provide elements of on-the-job training for the next jobs in the progression lines, and the Attorney General has agreed that "the job skills in the plant are acquired by on-the-job training." This fact, in turn, means that through the operation of the procedure that the first man to reach a job is the first to advance to the next job, the employee who advances is the one who has had the most on-the-job training for the next job.

It means as well that the abolition of this procedure would advance employees who might have the least time on a job and therefore the least training for the next job. This is a result which requires the assumption that with less than the amount of on-the-job training now acquired by reason of the progression procedure, employees could move into the jobs in the progression lines and perform those jobs satisfactorily and—more importantly—without danger of physical injury to themselves and their fellow employees, and that is not a permissible assumption on the record in this case.

6. In summary, the court finds from the evidence on this subject that the progression procedure in question was not a new standard created in 1962 in connection with the integration of the lines of progression, that the procedure has been and is applied in every context to give first advancement to the first man who has reached a job, and that this progression procedure operates for the benefit of the employee, Negro or white, who first reaches a job, with the result that there are Negro employees with less departmental seniority who have been and are progressing ahead of white employees with more departmental seniority.

### H. Mill Rolling and Mill Auxiliary departments:

The allegation on this subject is that "The Company has classified its rolling mill employees artificially into two separate departments, called 'mill tonnage' and 'mill auxiliary', so as to exclude Negro employees from the higher paying rolling mill jobs." The court finds the facts regarding this issue to be as follows:

1. There are two mills which are in operation at the Company's plant. They are referred to as the No. 2 Mill and the No. 3 Mill, the No. 1 Mill having been taken out of operation some 30 years ago. There is also a smaller mill which is referred to as the "Web Mill" but which was not in operation at the time of the trial and had not been used for some time.

2. The rolling of steel is an intricate process by which rough slabs known as billets are elongated, reduced, and shaped by being passed through sets of rolls which contain grooves (known as "passes") and which, in successive stages, form the billet to the size and shape of the end product.

The rolling process on the mills at the Company's plant is in general terms as follows: When the billet has been heated to the proper rolling temperature in the heating furnaces,[47] it is transferred on to the rolling mills and is moved by conveyors to the breakdown

---

47. The furnaces are also referred to as reheating furnaces, but the accurate terminology is heating furnaces.

mill, which is so named because it elongates and breaks down the rough form of the billet and begins forming it to the shape of the end product. After completing several passes through the breakdown mill, the bar travels to the roughing mill and then to the strand mill on the No. 2 Mill and to the finishing mills on the No. 3 Mill, where it is rolled to the specified size and shape. From the last stand of the rolling mills (which is the strand mill on the No. 2 Mill and the finishing mills on the No. 3 Mill), the bar is then run out through the conveyor troughs located in the middle of the hotbeds.

Since the shape and specifications of the bars which are being rolled are determined by the rolls and the passes in the rolls, the various shapes and sizes of the Company's products are produced by changing the rolls and moving and adjusting the guides which direct the bars into the proper passes of the rolls. It is further necessary to set and adjust the rolls and guides in their proper positions in order to produce bars that will meet the required close tolerance specifications to which they must be rolled.

The Mill Rolling or Tonnage department is composed of the jobs which perform the functions involved in this rolling process on the mills and in the changing, setting, and adjusting of the rolls and guides. For example, the Roughers turn the bar at the proper angles necessary to enter the passes of the breakdown mill, the Manipulator Operators operate the controls which move the bar back and forth through the passes of the breakdown mill, and the Ringout Saw Operators control the movement of the bars from the breakdown mill to the roughing mill and the finishing mills and operate the hot saw.

The line of progression in the Rolling department leads up to the job of Roller, which is the most highly skilled and highest paid job in the plant.

3. The court finds from the evidence that the equipment which operates in connection with but not actually within the rolling process is known in the industry generally as well as at the Company's plant as mill auxiliary equipment and that the Mill Auxiliary department is composed of the jobs which perform these auxiliary functions.

For example, prior to the rolling process, the Yardman selects the proper grade and size of the billets required for the type of products to be rolled, the Skidman pulls the billets down skids to the heating furnaces, and the Charger operates the conveyor which takes the billets into the heating furnaces. During the rolling process, the Scrapman performs such duties as pulling off from the mill the bars that have to be scrapped, and the Ingot Straightner stands to the side of the breakdown mill on the No. 2 Mill to straighten bars as and when needed. After the rolling process, the bars are inspected, sheared, bundled, and weighed by jobs such as Inspector, Shearman, Bundler, Gauger, Trucker, and Assistant Foreman.

The line of progression in the Auxiliary department leads up to the job of Inspector.

4. The allegation that the Rolling and Auxiliary departments are an artificial classification is based initially and principally on the argument that the employees in these departments work in and around the same mill building and under common supervision and in geographical proximity to one another. To illustrate this point, the Attorney General prepared a diagram of the mills and had its witnesses attach red stickers representing the location of the Rolling jobs and green stickers representing the location of the Auxiliary jobs.

The fact of geographical proximity and common supervision of the Rolling and Auxiliary jobs is certainly true enough on the surface of the matter, but it is equally true, as Chief Judge Brown has phrased it, that "the surface is seldom

the stopping place." [48] Going beyond the surface, the evidence on this point is as follows:

(a) Employees who are in departments other than the Rolling and Auxiliary departments likewise work in the mill building and in geographical proximity to the Rolling and Auxiliary jobs. For example, Millwrights from the Mechanical department perform repair and maintenance duties on the mill equipment and work in the mill building in geographical proximity to the employees in the Rolling and Auxiliary jobs.

(b) The job of Mill Operator, which is in the Electrical department, was shown by the testimony not only to be in closer geographical proximity to the Rolling jobs than are the majority of the Auxiliary jobs but further to perform functions which are more closely related to the rolling process than are the functions performed by the Auxiliary jobs.

(c) The Rolling and Auxiliary departments are not the only departments in the plant which work in and around the same building and in geographical proximity to one another. Instead, the evidence shows that the Brickmason department and the Electric Furnace department work in the same furnace building and that the Roll Shop department and the Machine Shop (which is in the Mechanical department) likewise work in the same building.

(d) The Rolling and Auxiliary departments are not the only departments in the plant which are concerned with related phases of the production operations. For one, the Finishing, Fabricating, and Cold Draw departments are jointly concerned with the finishing operations. Similarly, the Brickmason department and the Electric Furnace department are both concerned with the maintenance and production functions in the melting and casting operations and are as closely related to one another as are the Rolling

and Auxiliary departments, if not more so.

(e) There are jobs in the Auxiliary department which work in closer geographical proximity to jobs in departments other than the Rolling department. For example, the evidence shows that the Yardman and the Crane Follower work in close geographical relation to the jobs in the Electric Furnace department and that jobs such as Bundler and Trucker work in close geographical relation to jobs in the Finishing department.

(f) The Rolling and Auxiliary departments are not the only departments which have common supervision. The Finishing departments consist of the separate Finishing, Fabricating, and Cold Draw departments, and they have common supervision. The Furnace departments consist of the separate Electric Furnace and Brickmason departments, and they have common supervision. The Yard departments consist of the separate Switch Yard and Rail Yard departments and they have common supervision.

▆ Therefore, taking into consideration the complete facts regarding this point and not merely the surface appearances, the court could not properly find from the fact that the jobs work in geographical proximity and under common supervision and in connection with related phases of the production process that the Rolling and Auxiliary departments are an artificial classification.

5. While it is not a point argued in the post-trial brief, some of the testimony elicited by the Attorney General at the trial was evidently directed to an attempt to show a functional relationship between the Rolling and Auxiliary jobs.

This would be true in the sense that the production of bars by the Rolling department depends at the one end on the delivery of billets to the heating

48. NLRB v. Douglas County Electric Membership Corp., 358 F.2d 125, 129 (5th Cir. 1966.)

furnaces and at the other end on the shearing and bundling and related operations performed on the rolled bars and in the sense that the Auxiliary department would have no function at all without the production of bars by the Rolling department. But if this is to be taken as a factor showing an artificial classification, it could not be confined to these two departments. It would instead have to encompass other departments as well, such as the Electric Furnace department, which produces the billets that are obviously essential to the Rolling department, and the Finishing and Fabricating departments that perform the operations necessary to produce the finished product.

It is true also that some jobs in the Auxiliary department work in conjunction with some jobs in the Rolling department, such as the Scrapman who is stationed in the area of the breakdown mill and the finishing mills. However, having heard the functions of the jobs explained by the testimony and illustrated in connection with the testimony by the photographs and diagrams of the jobs, the court cannot agree that this shows an artificial classification, for the fact remains that the functions which are being performed are quite different.

6. The theory which the Attorney General has urged in the post-trial brief is the argument that the Rolling and Auxiliary departments were in actuality created in October of 1962 when the lines of progression were merged throughout the plant and that before then, there was merely a single "mill department".

The points relied on by the Attorney General for this theory, and the evidence with respect to each, are as follows:

(a) The Attorney General places the principal reliance for this theory on Company records. For one, the Attorney General relies on the so-called "kardex cards", which are generally prepared by a secretary in Personnel Office and show for each employee hired such information as name, address, dependents claimed for withholding purposes, department in which hired, and date hired. With respect to these records, the Attorney General points to the use in these cards of the terms "mill" and "mill department". The Attorney General similarly places considerable reliance on the minutes of a Company-Union meeting in 1961 which quoted Personnel Director Wagner as having stated in answer to a grievance that "within the Mill Department there are two distinct Progression and Regression Groups: Auxiliary and Rolling."

If this had been all of the evidence on the point, it might have justifiably been said that the Rolling and Auxiliary jobs had actually been regarded as one "mill department" at the time these records were prepared. But it is by no means the total of the evidence, and with the evidence which the court has heard and cannot disregard, the most that can justifiably be said is that the terminology which has been used in reference to the departments at the plant has been highly loose and considerably less than accurate and consistent, both in the Company records and orally as well.

To be specific, the evidence shows that just as the Mill Rolling and Mill Auxiliary departments have been referred to in Company records as the "mill" and "mill department", so also have the Company records referred to other separate departments by a single term. For example, although there is no dispute with the fact that the Furnace and Brickmason departments are separate, there are Company records using the term "Furnace" when the accurate reference should be to the Brickmason department. Similarly, although there is no dispute with the fact that the Switch Yard and Rail Yard departments are separate, several of the same kardex cards that use the terms "mill" and "mill department" also use the term "yard" without distinguishing between the Switch Yard department and the Rail Yard department.

The fact that the Rolling and Auxiliary departments have not been consis-

tently referred to as departments and have also been referred to as crews or as progression and regression groups has a similarly minimal evidentiary weight in view of the evidence that the other departments have likewise not been consistently referred to as departments. For example, the Finishing department is also referred to as the Hoop Shop, the Fabricating department is also referred to as the Fab Shop, and the Brickmason department is also referred to as the Brickmason Crew. It was, in fact, the court's impression during the trial that the witnesses, both for the Attorney General and for the Company, more frequently referred to the departments by their colloquial names than by their proper departmental names.

(b) The plaintiff further relies on the departmental line-ups which are posted to inform employees of the jobs and days they are to work during the ensuing week. For some years prior to 1966, the line-ups set out the Rolling and Auxiliary jobs on the same page and without distinguishing between the jobs by department, and in 1966, they were separated into one line-up for the Rolling jobs and another line-up for the Auxiliary jobs.

Standing alone, this separation of the line-ups would be regarded by the court as subject to suspicion and critical scrutiny. But the fact is that the matter does not stand alone and that the evidence on the point dispels any suspicion of improper motive or purpose in the separation of the line-ups.

It was explained by Personnel Director Wagner that he separated the line-ups in 1966 and that he did so because the scheduling of both Rolling and Auxiliary jobs on one line-up crowded too many names and jobs on a single page and had for this reason resulted in employees failing to report on the days and jobs for which they had been scheduled. Having observed the witness, the court credits this testimony as providing the accurate and truthful explanation for the separation of the line-ups and finds that such is the fact.

It was furthermore established through the testimony that there were separate line-ups for the Rolling jobs and the Auxiliary jobs in the 1940's, just as there have been since 1966. An employee who started in the Mill Auxiliary department in 1942, went into the Army during the war, and returned to the Mill Auxiliary department in 1946 testified that both when he started in the department in 1942 and returned to it in 1946, the Auxiliary and Rolling line-ups "were on separate sheets just like they are now". This witness was not cross-examined and is credited by the court, the testimony is not disputed, and the court is satisfied from the evidence that the use of separate line-ups since 1966 is nothing more than the identical situation which existed in the 1940's and has no improper motives or questionable overtones.

(c) While it is not a point which has been argued, the court has further considered the fact that a white employee in the Auxiliary department testified that when he was hired in 1952, he worked his first shift on a Rolling job. Since the rule which was in effect at that time was that an employee's department was established by where he worked his first shift and since the employee's seniority in the Auxiliary department is the date he was hired, the court has posed to itself the question of whether this should be taken as evidence that there was at that time no distinction between the Rolling and Auxiliary departments.

However, having considered the question, the court is satisfied that the testimony could not be stretched enough to sustain such an inference. It was the witness' further testimony that the first day he worked when he was hired in 1952 was a Saturday, that the Rolling job to which he was assigned on that Saturday was an extra job, called for by the type of product being rolled, that he worked an Auxiliary job on the next day, which was Sunday, and that he has been working in the Mill Auxiliary department since then.

It is therefore doubtful that this evidence could properly be taken as having established more than the fact that this employee was assigned for one shift to an extra job on a Saturday in 1952.

Moreover, the court considers the matter to have been conclusively resolved by the further evidence that it was not uncommon for newly hired employees to be assigned temporarily to departments other than the one for which they had been hired and in which their seniority was established as of their hiring date.

(d) Although it is likewise a point which has not been mentioned in the briefs or arguments, the court has noted in reviewing the exhibits that some of the kardex cards of employees who are in the Rolling department show them as having first worked a job which is in the Auxiliary department. More specifically, the circumstances are as follows: There is actually no space on the kardex cards for the recording of the job first worked, and most of the cards have no such record. However, with respect to some of the cards, the name of jobs have been written in the space for the recording of the employee's clock number, and several of the cards have written in jobs that are in the Auxiliary department. For example, for an employee hired in 1949, there is the word "Scrap"; for an employee hired in 1950, there is the word "Pull-On"; and for an employee hired in 1937, there is the phrase "Roll Change Helper." [49]

Viewing the evidence in the light most favorable to the plaintiff, it is difficult to give substantial weight to these notations. For one thing, the kardex cards themselves are considerably less than completely authoritative. They are usually prepared by a secretary in the personnel office, they are generally used as a "quick reference" to determine the location of employees, and they are not used or relied on to take precedence over facts as shown by such documents as the seniority lists or transfer records.

Moreover, and entirely aside from the weight which could properly be given to these kardex card notations, the court is satisfied and finds that they are no more than illustrations of the fact that new hires were at times temporarily assigned to departments other than the department for which they were hired and in which their seniority was established.

To summarize the points relied on by the Attorney General, the court finds from the evidence that the geographical proximity and common supervision of the Rolling jobs and the Auxiliary jobs do not sustain the allegation that this is an artificial classification, that such functional relationship as there is between the Rolling and Auxiliary jobs is entirely insufficient to show that the departments constitute an artificial classification, and that the references in Company records to "mill" and "mill department" do not show that there was a single mill department prior to 1962.

7. It would furthermore be a triumph of paper form over substance to agree with the Attorney General's theory on this subject, for based on the evidence which it has heard, the court is thoroughly convinced and finds that the Rolling and Auxiliary departments have in fact been constituted and regarded as separate departments from their inception because of their different functions.

The evidentiary points which together establish these facts are as follows:

(a) To start at the earliest chronological point, the court finds from the testimony that before the departmental structure of the plant was established, there was a Rolling crew and an Auxiliary crew, that they were separate crews,

49. There are other cards which use the phrase "Extra Man". On this point, there is no dispute with the testimony that this did not designate a job but meant the employee was hired as an extra man. Other of the cards show employees in the Rolling department as having first worked jobs in the Rolling department.

and that when the departmental structure was established with the organization of the Union in the early 1940's, the Rolling crew became the Rolling department and the Auxiliary crew became the Auxiliary department.

(b) The court finds from the evidence that prior to 1962, the Auxiliary department included jobs held by white employees because they performed auxiliary functions.

At the first, there is the evidence regarding the placement and maintenance in the Auxiliary department of the jobs of Inspector, Assistant Foreman, and Yardman. These jobs were established in the late 1930's or early 1940's, and at that time, and until the merger of the lines of progression in 1962, they were jobs held by white employees. Therefore, if the Rolling and Auxiliary departments had been an artificial or racial classification as the Attorney General alleges, it is beyond question that these jobs, held by white employees, would have been initially placed and thereafter maintained in the Rolling department. However, the evidence establishes, and the court finds, that when the jobs were created they were placed in the Auxiliary department and that they have been maintained in the Auxiliary department because they perform auxiliary functions rather than rolling functions.

Similarly, there are and have been separate incentive plans for the Rolling and Auxiliary departments, and if these departments had been an artificial or racial classification, it would not be expected that the white employees who held the Inspector, Assistant Foreman, and Yardman jobs prior to 1962 would have been paid under the incentive plan of the Auxiliary department. But here again, there was no dispute with the testimony of a white employee that he had been in the Mill Auxiliary department since 1942 and had always been paid under the incentive plan of the Auxiliary department.

(c) The evidence regarding the seniority status of employees who have transferred between the Auxiliary and Rolling departments further establishes that they are and have been separate departments. It is obvious enough that if the Rolling and Auxiliary departments had not been constituted or regarded as separate departments, then employees could have transferred from the one to the other without losing their seniority in the department from which they transferred. By comparison, it would have been identical to the situation of an employee who transfers from the Machine Shop progression line to the Millwright-Welder progression line within the Mechanical department and retains his seniority since he remains in the same department.

However, this was not the case with respect to the Rolling and Auxiliary departments. The evidence shows that in 1952, and again in 1961, white employees who had been in the Auxiliary department transferred from there to the Rolling department and that in so transferring, they lost their seniority in the Auxiliary department and started in the Rolling department as new employees at the bottom of the seniority list. The evidence similarly shows that another white employee in the Auxiliary department inquired in the 1950's about transferring to the Rolling department and was advised that if he transferred to the Rolling department, he would have to lose the seniority he had accumulated in the Auxiliary department.

(d) The functions of the Rolling and Auxiliary departments and the jobs in each have been explained in combined oral and graphic form through the use in conjunction with the testimony of photographs showing the jobs being performed. The court is firmly convinced and finds from this explicit verbal and visual explanation that the functions of the Rolling and Auxiliary departments are different, that because of the close tolerances to which bars must be rolled, the intricacy of the rolling equipment,

and the critical importance of the proper setting of the rolls and guides, the jobs in the Rolling department require a considerably different degree of skills and abilities than the jobs in the Auxiliary department, that while the Rolling jobs provide the training and experience required to hold the most highly skilled job of Roller, the Auxiliary jobs do not provide such training, and, in sum total, that this is neither an artificial nor an arbitrary classification but is in fact a functional classification based on the different functions of these departments.

8. While the facts regarding the Rolling and Auxiliary departments as they are constituted and function at this one plant are determinative of the point at issue, the court should for complete analysis say further that what is here alleged by the Attorney General to be an artificial classification was shown by the evidence to be in fact typical of the classification and structure of mill seniority units in the industry generally and with no question of racial separation.

The evidence on this point consisted of the testimony of witnesses whose qualifications to speak on the subject were not questioned. One witness testified on the basis of his position as rolling mill superintendent of the Algoma Steel Corporation of Sault Ste. Marie, Ontario, Canada and as chairman of a rolling mill committee of the American Iron and Steel Institute. Another witness testified on the basis of an experience of some 45 years in steel mills throughout the country and on having planned and set up mill crews and mill jobs both in this country and abroad.

The testimony which the court heard from these witnesses establishes beyond doubt that while there are differences from mill to mill in the placement of specific jobs for the reason that no two mills are exactly alike in their operation and equipment and that while there are differences in terminology from mill to mill, it is the common, typical, and universal arrangement in rolling mills throughout the United States and in Canada to have separate departments or promotional sequences for the rolling jobs on the one hand and the auxiliary jobs on the other hand. As phrased by the quite positive and firm testimony of these witnesses, it is absolutely the case that all mills have this classification of rolling jobs and auxiliary jobs being in separate promotional units, and there are no mills that do not have this dichotomy between rolling jobs and auxiliary jobs.

According to their further testimony, this dichotomy is based on the considerations that rolling jobs and auxiliary jobs have different functions, that the rolling jobs can be and are utilized in the changing and adjusting of rolls and guides during production turns, and that the jobs in the rolling promotional sequences provide training and experience for the higher rated rolling jobs and for the highly skilled Roller job while the jobs in the auxiliary promotional sequences do not provide this training and experience.

The testimony of these witnesses likewise established that while there are some differences in the placement of certain jobs, as is the case generally from mill to mill in the industry, the classification of the Rolling and Auxiliary jobs at the Company's plant is basically similar to the common and typical classification in rolling mills generally.

It was equally established beyond doubt that this separation of departments or promotional sequences has no connection with race or racial separation, that it exists at mills—such as in Canada—where there are no Negroes and where the auxiliary jobs are held predominately or entirely by white employees.

The Attorney General's position in reply to this evidence has been the argument that the departmental and seniority structure at steel mills elsewhere is "completely irrelevant" and that the only permissible area of consideration consists of the Rolling and Auxiliary

departments at the Company's steel mill in Birmingham.

 With the area of consideration confined as argued by the Attorney General, the court has found that the artificial classification allegation cannot be sustained. But to go further and consider this point, the court would have to reject the Attorney General's argument that this evidence is immaterial. That is an unduly myopic view of the matter. The complaint in this case having raised the issue by the allegation that the Rolling and Auxiliary departments are an "artificial classification", it would be manifestly improper to deny the defendants the right to answer this allegation by showing that this same classification exists throughout the industry for functional reasons.

Furthermore, the court cannot disregard the fact that during the pre-trial proceedings in this case, the Attorney General filed a Rule 34 motion seeking entry to the Company's steel mill in Huntington, West Virginia and explained the purpose of the motion as being that if the Company did not have separate mill departments at the Huntington plant, this would be evidence of an artificial classification at the Birmingham plant. The court agreed with the Attorney General in this theory and accordingly granted the motion. It having then been shown by the testimony at the trial that the Huntington plant in fact has separate departments on the mills as is the case at the Birmingham plant and in the industry generally, the court certainly could not now say that the point is immaterial.

9. The evidence further established another point which is both interesting from the historical standpoint and emphasizes the dichotomy between the rolling jobs and the auxiliary jobs in rolling mills generally.

This is the fact that the early practice in the steel industry, brought to this country from the steel mills in England, was that the Roller was an independent contractor. The Rollers accordingly were paid by the companies for rolling the steel and in turn hired and fired and paid their rolling crews. At the same time, the companies employed and paid the employees comprising the auxiliary crews.

I. Jobs alleged to be essentially similar:

The allegation that "Some jobs that Negro employees perform are essentially similar to jobs that white employees perform" has been established as having reference to the jobs of Catcher, Furnace Helper, and Roll Change Helper in the Mill Auxiliary department as compared with the jobs of Layover, Heater Helper, and Roll Changer Grade III in the Mill Rolling department.

This allegation should first be placed in its proper factual and analytical perspective.

To begin with, the Company says that the allegation is factually inaccurate in characterizing the jobs in question in the Rolling department as "jobs that white employees perform", since the Layover and Roll Changer Grade III jobs are being performed by Negro employees. That is true enough, but it is not grounds for declining to consider the allegation.

It is also true that there are other jobs in the plant which are essentially similar but which have not been brought into issue by the complaint. For one, the Record Clerk in the Cold Draw department is essentially similar to the Loading Foreman in the Finishing department, and it may be that the absence of an allegation with respect to these jobs might perhaps be attributable to the fact that the Record Clerk is the third job from the top of the progression line in the Cold Draw department and that a Negro employee in that department has advanced to it.

 While this may to some extent create the impression of being asked to consider less than the complete facts regarding similar jobs, the court is nevertheless of the opinion that the allegation may properly be maintained even if the

Attorney General has selected less than all of the jobs in the plant which might be essentially similar. This is especially true in view of the evidence that there are differences from mill to mill in the placement of particular jobs in the rolling promotional unit or in the auxiliary promotional unit and that the status of jobs can change due to new techniques or the performance of new or different duties, with the result that a job which was concerned with auxiliary operations can become more closely related to rolling operations. So here, if the evidence showed that any of the three jobs in question in the Auxiliary department should be appropriately placed in the Rolling department, the court could properly and will direct that result.

Turning now to the evidence, the court finds that the facts regarding this allegation are as follows:

### 1. Roll Change Helper and Roll Changer Grade III:

The background facts are that during each 24 hour period of the work week, the mills are operated on production turns on the 7–3 shift and 3–11 shift and then are shut down on the 11–7 shift so the rolls used during the preceding day's production can be taken out and replaced by new rolls for the products to be rolled the next day. This process is referred to as tearing down the mill, which consists of taking out the rolls and guides using during the preceding day, and building up the mill, which consists of installing the new rolls and guides.

The jobs that work on this roll change turn consist of the Rolling department jobs of Roll Change Roller, Roll Changer Grade II, and Roll Changer Grade III and the Auxiliary jobs of Roll Change Helper and Clean Up. There is no allegation or issue with respect to the Clean Up job, which cleans out the scale accumulated during the day's rolling and performs some duties in connection with tearing down the mill. It is alleged, however, that the Roll Change Helper job is essentially similar to the Roll Changer Grade III.

The evidence on this point is that the Roll Change Helper was originally established to be no more than a crane follower and to perform the function of crane hooking during the 11–7 shift, that this crane hooking function required less than the full time of the employees working the job, that the employees holding the job have over the years assumed more duties than the crane hooking function, and that by reason of this fact, the job has increasingly taken on duties similar to the functions of the Roll Changer Grade III.

 The court accordingly finds from this evidence that while the Roll Change Helper job was originally created to perform the auxiliary function of crane hooking, it has in the process of time evolved to the point that is now essentially similar to the Roll Changer Grade III in the duties and functions performed.

There remains the question of whether this similarity might be regarded as constituting racial discrimination. The evidence on this point provides considerably less than a firm basis for such a finding, since the most that can be inferred from the evidence is that the employees holding the Roll Change Helper job on their own assumed functions other than the duty of crane following. However, the court is of the opinion that it is not necessary to reach this question, because Vice-President Blake stated to the court in testifying that he thought the employees holding the Roll Change Helper job should be moved to the Rolling department for the reason that this job has become increasingly similar to the Roll Changer Grade III. Therefore, the court may properly so hold and will so order without concern for a finding of discrimination.

There was likewise no evidence from which it could be inferred that the Roll Changer Grade III has no more duties or responsibilities than the Helper, and there might for this reason have been

another problem of determining the point at which the Helpers should be placed in the line of progression in the Rolling department. But here again, the problem is academic, because the procedure proposed by Mr. Blake consists of effecting the simultaneous transfer and promotion of the employees holding the Helper job by placing them in the Roll Changer Grade III job. This being the procedure most favorable to the Negro employees, the court will certainly adopt it.

## 2. Furnace Helper and Heater Helper:

 There are two heating furnaces, one for each of the mills, which heat the billets to the temperature necessary to place them in the proper malleable state so they can be elongated and shaped by the rolls. When a billet has been heated to the proper temperature, it is ejected from the furnace by a bar known as th ejector bar.

The allegation of essential similarity between the jobs of Furnace Helper and Heater Helper is based on the fact that both jobs perform the function of activating the ejector bar. This results from the relief procedure followed. The heating furnaces operate continuously on the 7–3 and 3–11 shifts, and the Heater and the Heater Helper are full time jobs. One of the duties of the Heater Helper is to operate the ejector bar, and he is given relief in the performance of this duty by the Furnace Helper for thirty minutes out of every hour and a half cycle of the shift. Therefore, for 2½ hours out of the 8 hour turn, the Furnace Helper performs this function of activating the ejector bar.

The Heater Helper and Furnace Helper jobs are therefore not just similar but identical with respect to 2½ hours per turn that the Furnace Helper activates the ejector bar. If, then, this had been the total of the evidence, the court would agree with the allegation and find that the jobs are essentially similar.

But this is not the total of the evidence, and the court cannot disregard the further evidence on the subject. The evidence first shows, and the court finds, that the operation of the heating furnaces is an important element in the rolling process. The heating of the billets requires the skill and experience necessary to maintain the proper temperature for the particular grade of steel which is to be rolled and to maintain the proper ratio of gas to air and the proper length of the flame. The evidence further shows without dispute, and the court finds, that the Heater Helper has the responsibilities of assisting the Heater in this operation of the furnaces and adjustment of the controls governing the ratio of gas to air and the length of the flame and himself performing these operations while the Heater is away from the furnaces. The evidence similarly shows, and the court finds, that by reason of having worked the preceding jobs in the Rolling department line of progression, the Heater Helper is better qualified to recognize the importance to the rolling operations of properly heating the billets.

On the other hand, there is equally no dispute with the evidence from which the court finds that the Furnace Helper, in contrast, spends only 2½ hours per shift at the furnace and, during the remaining 5½ hours of the shift, performs other and unrelated duties such as spelling the Charger and Charger Helper and picking up and banding scrap billets which have been ejected at the breakdown mill.

The court considers this to be a close question. However, after having carefully weighed the evidence and the arguments, the court is of the opinion that it would be superficial analysis to consider in isolation the manual function of activating the ejector bar during 2½ hours out of an 8 hour turn and that viewing the facts in their entirety, the preponderance of the evidence establishes that the jobs are not essentially similar. The court accordingly so finds.

### 3. Catcher and Layover:

 The background facts regarding this issue are that each of the mills has a hotbed which is 200 feet long, that the bars travel from the last stand of the rolling mills in conveyor troughs located in the middle of the hotbed and are ejected from the troughs by automatic throw-out arms, and that the bars are allowed to cool on the hotbed from this red-hot condition before they are sheared, bundled, and weighed. The Layover is stationed at the end of the hotbed adjacent to the last stand of the rolling mills, and the Catcher is stationed at the opposite end of the hotbed adjacent to the shear tables.

For the allegation that the Layover and the Catcher are essentially similar jobs, the Attorney General relies on the fact that they together perform the function of gripping the bar with tongs after it has been ejected from the trough and guiding it to the edge of the hotbed for cooling. However, with analysis limited to this function relied on by the Attorney General, and without more, the court finds that the jobs have been substantially different in years past and that differences remain today.

There is no doubt from the evidence that the Layover was originally a highly skilled job with respect to this function. It was the responsibility of the Layover to stop the bar himself with tongs while it was moving in the conveyer trough at a speed of some twenty-five miles per hour, pull the end of the bar out of the trough, and then turn around and flip the bar in order to eject it from the trough onto the hotbed. It was the further responsibility of the Layover to apply the tongs to stop the bar in the trough at precisely the right moment, in that if he did so too soon the back end of the bar would wad up against the tongs and if he did so too late the bar would be missed altogether.

The degree of skill required of the Layover with respect to this function has without doubt declined over the years because of the installation of automatic throw-out arms in the troughs and because of the production of heavier bars which are not as likely to be damaged while being handled with the tongs. At the same time, however, it was established by the testimony of witnesses both for the Attorney General and the Company that the Layover continues to have the responsibility, which the Catcher does not, of pulling out of the conveyor troughs the bars which are longer than the length of the throw-out arms. For example, using a photograph of a Layover, it was explained through the testimony that he places the tongs on the bar as it moves through the conveyor trough and, when the end of the bar is reached, he applies pressure on the tongs and then turns around and pulls it out of the trough. At the same time, according to the testimony of employees who have worked the Catcher job, the Catcher takes the opposite end after it has been ejected from the trough and is out on the hotbed.

Similarly, consistent with the fact the Layover must be over the conveyor troughs to pull out these bars, it was the testimony of witnesses for the Attorney General as well as the Company that while the Layover works up on the hotbed, the Catcher is more often than not down on the floor behind the hotbed.[50]

Still, if this had been all of the evidence on the subject, the court would have been inclined to the view that in a manner comparable to the Roll Change Helper having become similar to the Roll Changer Grade III, the Layover had evolved to similarity with the Catcher because of the decline of the degree of skill required in pulling bars out of the conveyor trough.

However, the further evidence convincingly established that the jobs are

---

50. It was observed that the witnesses who placed the stickers designating the Catcher job on the diagram of the mills located them behind the hotbed, except when specifically asked to locate them on the hotbed.

fundamentally different by reason of the duties of the Layover in the important function of changing and adjusting the rolls and guides during the production turns.

To roll the various shapes and sizes of bars produced by the Company, it is necessary not only to tear down and build up the mills on the 11–7 roll change turn but as well to change and adjust the rolls during the 7–3 and 3–11 production turns for reasons such as the rolls wearing out and having to be replaced, a change from the production of one type of product to another, adjustments required to hold or bring the bar within the specified tolerances, or cobbles which damage or break the rolls or guides.[51] This function of changing and adjusting the rolls and guides during the production turns is performed by the Rolling jobs, at this plant and in the industry generally, not as an arbitrary matter, but for the reason that the Rolling jobs are familiar with the rolling equipment and guides.

The court finds from the evidence that the Layover has this responsibility and function, since he is located adjacent to the last stand of rolling mills on both of the mills and is familiar with the guides and mill settings which are involved in the changing and adjusting of rolls and guides. The evidence similarly shows, and the court finds, that this function is of considerable importance, since the changing and adjusting of the rolls and guides during the production turns must be accomplished as rapidly as possible so that the mills may resume operation with the least amount of downtime.[52]

Although it has not been argued, it might be said that the Catcher could work in the changing of rolls and guides if the job were in the Rolling department. While the Catcher is at the far end of the hotbeds and therefore could not reach the rolls to be changed or adjusted as rapidly as the Layover and obviously could not police the last stand of rolling mills as can the Layover, it is true that the Catcher could perform this function if in the Rolling department. But for that matter, so could any number of other jobs which work in the mill building. For one, the Mill Operator, who is in the Electrical department, could perform this function if in the Rolling department and could probably do so more rapidly than the Catcher since he is located over the rolling mills rather than at the far end of the hotbeds.

Another aspect of this matter is concerned with mills elsewhere in the industry which have automated their hotbeds so that the bars are moved by mechanized equipment to the edges of the hotbed. The mills that have these automatic hotbeds have a job known as "automatic hotbed operator" which operates the mechanized equipment and at the trial, the Attorney General asked the Company's witnesses on cross-examination whether, in the industry in general, the automatic hotbed operator job was commonly in the rolling or in the auxiliary promotional units. The idea, it may be assumed, was to show that if the automatic hotbed operator is commonly in the rolling promotional unit, then both the Catcher and the Layover should be in the Rolling department here. However, the evidence showed no

---

51. The term "cobble" has reference to a bar that fails to complete the rolling process, due to such factors as hitting a guide or not coming through a pass.

52. In reviewing the depositions and exhibits, the court notes evidence that in connection with rolls that have broken down during production, the Catcher has a function of "coupling and uncoupling". However, there is no evidence regarding the nature of this duty or the extent to which it is performed. Furthermore, since one of the Catchers testified at the trial that he did not know what functions the Layover performed during roll changes because he was too far away, it is reasonable to say that whatever the coupling and uncoupling duty may consist of, it is not a regular or substantial function.

set pattern with regard to the placement of this job, since it is found in both rolling promotional units and auxiliary promotional units. Moreover, since the court has found that the fundamental differences between the Layover and the Catcher are more in connection with the functions of the Layover in the changing and adjusting of the rolls during the production turns than in connection with the function of moving bars to the side of the hotbed, the point is not material.

The remaining aspect of this matter is the Attorney General's reliance on the fact that the wage rate of the Catcher was upgraded equal to the rate of the Layover as the result of a wage rate inequity grievance filed by the Union in connection with the contract negotiations which were held in 1965.

The background is that there is at this plant a procedure, called the wage rate inequity procedure, by which claims for the upgrading of the wage rates of specific jobs may be filed in connection with the negotiation of the Union contracts on the ground that the job for which the upgrading is sought is comparable to a higher rated job in other departments and therefore should be paid a comparable rate. During the negotiations for the Union contract in 1965, the Union filed some 38 inequity grievances. One of these was the grievance which claimed that the Catcher should be paid at the same rate as the Layover and which was granted by the Company along with several other grievances concerning other jobs.

By way of further background, the equalization of wage rates pursuant to an inequity grievance is not necessarily based on the similarity of the jobs as such but on the premise that the sum total of the content of the jobs are comparable with respect to such factors as manual exertion or exposure to heat and danger. This is illustrated by the jobs of Ladle Helper in the Electric Furnace department and Brickmason in the Brickmason department. The jobs are equally rated as the result of the Brickmason having been upgraded equal to the Ladle Helper through an inequity grievance, as the Catcher was upgraded equal to the Layover, but at the same time, the Ladle Helper and Brickmason jobs are not similar in their duties and functions.

The upgrading of the Catcher rate equal to Layover rate is certainly evidence of a similarity between the jobs. However, the court must find that it is not enough to outweigh the evidence showing the dissimilarity of the jobs.

In the first place, the practical factor of compromise which is inherent in Company-Union negotiations should warn against reading too much into concessions which are granted as part of collective bargaining. This is illustrated by the fact that another of the inequity grievances filed in 1965 was the claim that the Furnace Helper was comparable to the Heater Helper and that the rates should be equalized. That inequity grievance was denied, and if the disposition of wage inequity grievances is to be given the weight contended for by the Attorney General, it would follow that the Furnace Helper and Heater Helper are not similar or comparable because the grievance regarding these jobs was denied. However, the fact of the matter is that from the evidence the court has heard, it is inescapable that there is considerably more similarity between the Furnace Helper and the Heater Helper than there is between the Catcher and the Layover.

In the second place, the court has the firm impression from the trial that the reason for the upgrading of the Catcher rate can most accurately be ascribed to the desire on the part of the Union to give the Negro employees working the job the benefit of the increased wage rate.[53]

---

53. According to the testimony, there were sixteen employees working the Catcher job at the time of the trial.

It is, in sum total, the considered finding of the court that the preponderance of the evidence establishes that there are substantial and important dissimilarities between the Layover and the Catcher jobs and that the ideas of the Attorney General or the court with regard to the way that jobs might be realigned cannot properly be substituted for an alignment which is shown by the evidence to be based on legitimate considerations.

J. Extra Board:

The evidence regarding the plaintiff's allegation of discrimination in the making of temporary assignments from the Extra Board is as follows:

1. The Extra Board, which is prepared weekly, is composed of the employees who are not expected to be scheduled to work regularly in their own departments during the ensuing week. It thus includes employees who have recently entered departments and have not yet built up enough seniority to be scheduled every day and employees who have been cut back by a reduction in force in their departments.

Not all of the names which are placed on this list at the time it is prepared will necessarily remain on the Extra Board, since there will usually be some who will be scheduled regularly to jobs in their departments and therefore are removed from the Extra Board.

The Extra Board is then used during the ensuing week by the personnel clerk to call employees for assignments to the temporary vacancies which arise during the week due to such circumstances as vacations, absenteeism, and temporary increases in operations.

2. At the time that this suit was filed in June of 1967, the procedure by which employees were called for temporary assignments from the Extra Board was as follows: First, if there were employees on the Extra Board who held their seniority in the department in which the temporary vacancies arose, they received first preference for the assignments to such jobs in their own department. Thereafter, the procedure was to call employees in the order of their Company age, but with the modifications that preference was given to employees who had previously satisfactorily worked the job to be filled and that for vacancies anticipated to last for several days or the entire week, preference was given to employees who would be available for the duration of such vacancies rather than to employees who would be available for a day or so only.

3. Using records which had been inspected and copied pursuant to Rule 34 discovery, the Attorney General prepared a set of exhibits setting forth the name and race of employees who had been assigned from the Extra Board during the first six months of 1967 to fill temporary vacancies in the four jobs of Ringout Saw Operator, Hot Saw Operator, Transfer Operator, and Roll Changer Grade III, which are the highest paying of the jobs to which assignments from the Extra Board are made to fill temporary vacancies. This set of exhibits showed that during the first six months of 1967, white employees had worked substantially more hours in those jobs through temporary assignments from the Extra Board than had Negro employees.

4. The Company points out that this set of exhibits prepared by the Attorney General shows the end result of Extra Board assignments to the four jobs by setting forth the employees who received the assignments but does not set forth the employees who were on the Extra Board and therefore does not show the circumstances of the assignments. For this purpose, the Company prepared an exhibit which reproduces the Extra Board as it existed on each day during the first six months of 1967, showing the employees on the Extra Board and the jobs to which they were assigned therefrom. This exhibit showed that there were on the one hand cases of senior white employees being assigned to lower paying jobs while junior Negro employees were at the same time as-

signed to higher paying jobs and that there were on the other hand cases of senior Negro employees being assigned to lower paying jobs while junior white employees were at the same time assigned to higher paying jobs.

5. The Extra Board exhibit prepared by the Company was reviewed by Vice-President Blake and the Company attorney in the Fall of 1967. Based on this review of the exhibit, Mr. Blake decided at that time that while there were cases of discrimination against senior white employees as well as against senior Negro employees in the Extra Board assignments, the Extra Board situation was questionable and that the procedure for calling employees from the Extra Board should therefore be changed by no longer giving preference to employees who had previously worked the job or who would be available for the duration of the vacancy and by using Company age as the standard for Extra Board assignments.

Although this decision was made in 1967, the implementation of it was deferred during the pendency of the pretrial proceedings in the case on the advice of counsel. It had been implemented at the time of the trial, so that the procedure by which employees are called for temporary assignments from the Extra Board is now as follows: First, employees on the Extra Board holding seniority in the department in which the temporary vacancy arises are given first preference for the assignments in their own departments in accordance with their departmental seniority. Thereafter, the procedure is to call employees in the order of their Company age, without regard to prior experience on the job and without regard to availability for the duration of the vacancy.

6. The Company takes the position on this issue that there are factors which militate against a finding of discrimination in the Extra Board assignments, and the court will now consider these points:

(a) For one, there are the cases that senior white employees were assigned to lower paying jobs while junior Negro employees were assigned to higher paying jobs. On this point, however, the court is not in the least prepared to say that the wrong of by-passing a senior Negro employee can be excused by the wrong of by-passing a senior white employee.

(b) For another, there is the fact that the Extra Board assignments are usually made by telephoning employees at their homes, often at night, and therefore depend on such diverse and uncontrollable circumstances as employees being at home when they are called. On this point, the court recognizes the difficulties inherent in judging in the relative quiet of judicial chambers the actions taken by the personnel clerk in attempting to contact employees at their homes. Nevertheless, the court is of the opinion that this factor fails to provide exoneration from the showing of the evidence regarding Extra Board assignments during the first six months of 1967.

(c) It is true as well that the personnel clerk was not called as a witness and that the evidence presented is not sufficient to establish a finding that he was deliberately giving preference to white employees because of their race. The most that can be inferred from the evidence is that the junior employees were called from the Extra Board for the assignments because they had prior experience on the jobs to be filled, and there is no evidence from which it might be said that their prior experience on the jobs may have been attributable to anything other than a non-discriminatory assignment.

On this point, however, the court is of the opinion that the Company had the burden of presenting such evidence at the trial and that given the absence of such evidence, the proposition that junior employees may have been called from the Extra Board because

they had prior experience resulting from non-discriminatory assignments is speculation and cannot militate against the finding sought by the Attorney General.

■ (d) It is furthermore true that the Company has abolished the procedure of giving preference to employees who had previously worked the job to be filled and who would be available for the duration of the vacancy and has adopted the procedure that Extra Board assignments are to be based on the standard of Company age. However, while it is only fair to say that the court is satisfied from having observed the witnesses that the Extra Board situation was known only to the personnel clerk, the facts remain that the Company must bear the responsibility for the situation and that the plaintiff is entitled to the injunctive relief requested on this issue.

■ 7. Therefore, having weighed the evidence in light of the objectives of Title VII, the court agrees with the Attorney General and accordingly finds that in making temporary assignments from the Extra Board, white employees were given preference over Negro employees during the period of time covered by the evidence on the subject.

K. Apprentice jobs:

■ The court finds the facts regarding the allegation of discrimination with respect to apprentice jobs to be as follows:

1. There are three apprentice jobs at the plant, consisting of the Machinist Apprentice in the Machine Shop, the Blacksmith Apprentice in the Blacksmith Shop, and the Roll Turner Apprentice in the Roll Shop. At any given time, there is one Machinest Apprentice, one Blacksmith Apprentice, and two Roll Turner Apprentices.

The last time that there was a vacancy in the Roll Turner Apprentice job was in 1966. The last time that there were vacancies in the Machinest Apprentice and Blacksmith Apprentice jobs was in 1964.

2. It is not necessary that an employee ask or apply for an apprentice job in order to be assigned to it. However, the evidence shows that there have been several cases of employees applying for apprentice jobs, that the employees who have applied for apprentice jobs have been white, and that some of these applications for apprentice jobs have been denied by the Company. There is no evidence that any Negro employee has ever requested or applied for one of the apprentice jobs, and there is no allegation of discrimination in connection with the apprentice jobs in the sense of actually denying an apprentice job to a Negro applicant.

3. Instead, the Attorney General's allegation, as phrased in the complaint, is that Negro employees have been excluded from apprentice jobs by being assigned to departments where apprentice jobs are not available and by being limited in their opportunities to transfer to departments where apprentice jobs are available.

This allegation has not been argued, and it is not sustained by the evidence.

The theory that there are Negro employees in departments where apprentice jobs are not available is obviously true. Since there are only three apprentice jobs filled by four employees on the one hand while there are fifteen departments on the other hand, it could hardly be otherwise. It is equally true as well that there are several hundred white employees who are in departments where apprentice jobs are not available and that there are Negro employees who are working jobs which are higher rated and pay more than the apprentice jobs.

The theory that Negro employees are limited in their opportunities to transfer to departments having apprentice jobs is essentially a repetition of the Attorney General's attack on the transfer privileges section. Moreover, with specific reference to the Roll Shop, the

Blacksmith Shop, and the Machine Shop, the evidence shows that:

(a) There has never been a request by a Negro employee for a transfer to the Roll Shop.

(b) There have been two Negro employees and two white employees who have requested transfers to the Blacksmith Shop. The evidence on this point is that the transfer requests by the white employees were denied by the Company, that one of the transfer requests by Negro employees was in 1967, which was three years after the Blacksmith Apprentice job had last been vacant, and that the transfer request by the other Negro employee was filed in May of 1968 and was pending at the time of the trial.

(c) There have been two Negro employees and five white employees who have applied for transfer to the Machine Shop. The evidence on this point is that the transfer requests of two of the white employees and one of the Negro employees were denied and that the transfer request of the second Negro employee was granted by the Company.

The Attorney General's response to this evidence consisted of the argument that it is not a requirement to apply specifically for transfer to the Machine Shop or Blacksmith Shop as distinguished from applying generally for transfer to the Mechanical department. The court agrees that there is no such requirement, but the fact remains that the Company has not limited the opportunities of Negro employees to transfer to any department, that there have been cases of employees applying specifically for the Machine Shop and the Blacksmith Shop, and that the evidence shows no discrimination in the disposition of those applications.

4. The court's review of the depositions has elicited the fact that the Attorney General at that time questioned the reason that the Negro employee holding the Blacksmith Helper job was not assigned to the Blacksmith Apprentice job when it was last open in 1964. If there should remain any question on the subject, it would be answered by the evidence that the Blacksmith Helper was approximately 61 years of age in 1964 and therefore would have been at retirement age at the same time that he would have been completing the apprenticeship period and that he was in fact scheduled for retirement in September of 1968.

L. Training:

The complaint alleges that Negro employees are not provided with the same opportunities provided white employees to acquire skills and to train for jobs. The court finds the facts regarding this allegation to be as follows:

1. At the outset of the trial, it was established through the testimony of employees that the Company has provided training for Negro employees for the jobs of Inspector, Assistant Foreman, and Yardman in the Mill Auxiliary department and the job of Weighman in the Finishing department and that the Company began providing this training in late 1962 or early 1963.

It was further established by the evidence that the Company has provided training for Negro employees for such jobs as Straightner Operator in the Finishing department, Shear Leaderman, Tagman, and Layout in the Fabricating department, Pickle Tank Operator, Shear Operator, Straightner Operator, and Record Clerk in the Cold Draw department, and the Craneman jobs in the Electrical department.

From having heard the evidence, the court is fully satisfied that rather than failing to provide Negro employees with training opportunities comparable to those afforded white employees as alleged, the Company has in fact provided substantial and special training opportunities for the Negro employees.

2. The Attorney General has not disagreed with this evidence regarding the training which the Company has offered and provided for Negro employees but says that the Negro em-

ployees who are working in the lower rated jobs in the Finishing, Fabricating, and Mill Auxiliary departments do not acquire on-the-job training for the higher rated jobs in other departments.

It must be reiterated, however, that the courts cannot be expected to find the facts on the basis of bits and pieces of the evidence and to disregard the rest of the evidence which has been presented through the trial. In this case, there is the evidence that the majority of these employees have voluntarily frozen themselves, or declined the Company's offers of training for the higher rated jobs, or given up the higher rated jobs after having been trained. There is the evidence that the Company has been providing Negro employees with training for the higher rated jobs and that Negro employees have been advancing into and working the higher rated jobs. There is the evidence that substantial opportunities of transfer are and have been available to these employees and that those who have availed themselves of these opportunities have benefited substantially.

This evidence stands undisputed and cannot be brushed aside or disregarded, and based on the complete evidence, the court finds that the facts of this case simply do not lend themselves to the theory urged by the Attorney General.

M. Opportunity to demonstrate ability to hold jobs:

The complaint alleged that Negro employees are not given the same opportunity to demonstrate ability to hold jobs as is given to white employees. It is most doubtful that the Attorney General has intended to pursue this allegation, since it was not mentioned as an issue in the pre-trial order prepared by the Attorney General, was not the subject of any evidence presented by the Attorney General, and has not been argued. Nevertheless, since it was raised as an allegation of the complaint, the

court has considered it and finds that the points established by the evidence with regard to this subject are as follows:

1. There is no appreciable difference in the number of Negro and white employees who have been disqualified from jobs.

2. There are Negro employees who have advanced in the lines of progression around disqualified white employees and are working ahead of them.

3. There has been one case regarding the disqualification of an employee which has been processed to arbitration, that case concerned a Negro employee, and Arbitrator Whitley McCoy, for many years distinguished professor of law and labor arbitrator, found that there was "no evidence at all from which I could find that the action of the Company was anything other than an honest decision, made in good faith, after much patience had been exercised in the hope he would improve in his ability to handle the equipment properly and with reasonable speed and efficiency."

Objecting to the introduction of this evidence at the trial, the Attorney General argued that the award of an arbitrator cannot be res judicata or binding on the court in a Title VII case. There has been no argument by the defendants that any such effect should be ascribed to the award, but to put the matter to rest, the court will say that it agrees with the Attorney General and has in no way regarded this arbitration award as in the least binding, final, or conclusive, for notwithstanding Professor McCoy's eminence in the legal and arbitration professions, he was not deciding the case in the framework of the statutory provisions of Title VII. Furthermore, as a general proposition, the court doubts that the courts should defer in their consideration of Title VII cases to arbitration awards.[54] At the same time, however,

54. Compare *Dewey v. Reynolds Metals Co.*, 291 F.Supp. 786 (W.D.Mich.1968). The

court leaves for a future day the further question of whether a procedure similar

the court cannot agree that an arbitration award must be dismissed out of hand as irrelevant and believes that it may properly be considered as an item of evidence, as it has been here.

■ The sum total of this subject is that if the Attorney General intended to press the allegation that Negro employees have not been given the opportunity to demonstrate ability to hold jobs, the only answer which could be given on the evidence in this case would be that there is nothing to support it and that the only evidence on the subject disproves it.

N. Labor Pool:

■ There was nothing said in the complaint or in the pre-trial order regarding the Labor Pool, but since there was testimony at the trial on the subject, it will be considered by the court for complete analysis of the case.

1. At the time of the trial, the Labor Pool consisted of some 15 employees working regularly in the general labor jobs and some 25 newly hired employees.

The newly hired employees may and do apply for transfers into the departments, are transferred as openings occur in the departments, and are in turn followed by more recently hired employees entering the Labor Pool. The employees who work regularly in the Labor Pool likewise have the right to apply for transfers into the departments.

2. The court can find no evidence of discrimination against Negro employees with respect to the exercise of their right to transfer from the Labor Pool into the departments.

For example, the evidence shows that of the 15 employees who were working regularly in the Labor Pool at the time of the trial, there were two employees who had applied without success for transfers to departments and that of these two employees, one is Negro and the other is white.

The court accordingly finds that there has been no discrimination in the exercise of the right of employees to transfer from the Labor Pool.

3. The court similarly finds that there is no evidence of discrimination against Negro employees in the administration and handling of requests for transfers from the Labor Pool. This is illustrated by the example that in 1966, the Company granted the requests of three Negro employees for transfers from the Labor Pool to the Cold Draw department but denied the requests of two white employees for transfers from the Labor Pool to the Cold Draw department on the ground that they were below the minimum aptitude standards of the department.

4. The court has reviewed the evidence regarding the lengths of time that newly hired employees have remained in the Labor Pool before transferring into departments to determine if there has been any discrimination against Negro employees in this respect but can find none.

Although the period of time that employees have stayed in the Labor Pool before transferring into departments is incapable of precise comparison because of such factors as the time that an employee applies for a transfer and the existence of openings in the departments to which transfers are requested, it appears to be an approximate average of several months. Some newly hired employees, however, have remained in the Labor Pool for two years or longer before being transferred into departments, and they have all been white employees.

5. Prior to October of 1962, there were no white employees in the Labor Pool, as was illustrated by the testimony of employees at the trial that when they worked in the Labor Pool in 1948, 1956, and 1959, it had no white employees in it. However, it is not disputed that the Labor Pool has been integrated since October of 1962, as is illustrated by the

to that applied by the NLRB in deferring to arbitration awards when certain standards are met should be adopted in the consideration of Title VII cases.

evidence that when the Company closed down a department in 1965, two of the white employees who had been in the department were placed in the Labor Pool and were not able to transfer out of it to another department because they could not meet the minimum departmental standards.

6. The court has further considered the evidence regarding the procedure for the assignment of newly hired employees to determine if there is any discrimination in this respect.

The background facts are that prior to 1964, the procedure was that newly hired employees were generally regarded as having established their seniority where they worked their first shift.[55] For example, employees who worked their first shift in the Electric Furnace department thereby became employees holding seniority in that department, and employees who worked their first shift in the Labor Pool were similarly regarded as Labor Pool employees until they transferred to departments. This first shift worked rule was abolished in 1964, and with the exception of employees hired on the basis of their prior experience for specific trade and craft jobs such as Machinest, the procedure since then has been that all new employees start in the Labor Pool, with the right to request transfers into departments.

The court has heard no allegation, argument or evidence of discrimination with respect to the assignment of employees to the Labor Pool since October of 1962. On the contrary, the evidence on the point is that during the period before 1964 when the first shift worked rule was in effect, there were both white and Negro employees who worked their first shift in the Labor Pool and were therefore regarded as Labor Pool employees by reason of the then existing procedure and that the employees who have been hired since 1964 have been assigned to start in the Labor Pool without regard to race. The court accordingly finds that these are the facts.

7. The Extra Board is used to fill the temporary vacancies which arise prior to the start of the shifts. There are further temporary vacancies which arise at the start of and during the course of the shifts due to such factors as employees being absent without having given prior notice or becoming ill during the shift, and the Labor Pool is used to fill these temporary vacancies.

The court has considered this aspect of the subject, particularly because of the evidence regarding assignments from the Extra Board, but it can find no evidence at all of discrimination in the assignment of employees from the Labor Pool to temporary job vacancies. The evidence on the point is that the assignments are made in the order of Company age, and there is no argument that there has been any deviation from this standard. On the contrary, there was evidence regarding a white employee who was in the Labor Pool as the result of being cut back from the Laboratory and who was assigned to work general labor jobs such as cleaning the bathhouses while Negro employees were assigned to temporary vacancies in jobs in departments in accordance with their Company age. It is therefore the finding of the court that there has been no discrimination in the temporary assignments of employees from the Labor Pool.

O. Representation by the Union:

The Union was not named as a defendant in the original complaint and was instead brought into the case pursuant to the court's order that it was a party necessary for just adjudication under Rule 19. There similarly was nothing in the pleadings or the pre-trial order raising any allegation against the Union. However, during the trial, the Attorney General orally asserted several claims against the Union.

---

55. The exceptions were the cases where an employee hired for a department was assigned temporarily to another department.

From the procedural standpoint, it is difficult to commend the assertion of claims for the first time in the trial stages of a case against a party which had theretofore been the subject of none and was in the case as a necessary party only. Nevertheless, in the interest of complete analysis of every point covered by the case, this final allegation has been considered by the court.

■ 1. The common denominator of the allegations against the Union was the theory, based on the line of cases emanating from the *Steele* doctrine,[56] that the Union has not fairly and impartially represented the Negro employees.

The initial claim directed at the Union was that it had not discharged its duty of fair representation of the Negro employees prior to October of 1962.

The court has held, and here reiterates, that analysis of this case has not been restricted to the period since Title VII became effective and that evidence regarding the period before then, and before the merger of the lines of progression in 1962, has been considered as competent and relevant. But to base a substantive allegation and a request for injunctive relief on events antedating 1962 is certainly asking more than is contemplated by this statute.

■ 2. The next claim voiced against the Union during the course of the trial concerned the fact that when the lines of progression were merged in 1962, some thirty-five Negro employees were placed ahead of white employees in the Electric Furnace department. According to the Attorney General's claim, the Union allegedly objected to the white employees having been subordinated to the Negro employees and asked the Company to reverse the order in which the employees had been integrated.

This allegation is based on the minutes of a Company-Union meeting in October of 1962 which quote the then president of the local Union as stating that he had "protested the line established for the Furnace Department, but the Company had implemented it and place (sic) it into effect." However, there is no evidence that the subject of this protest lodged by the Union president in 1962 was the fact that Negro employees had been placed ahead of white employees in the progression line in the Furnace department. On the contrary, the only evidence on the point consisted of the statement in the minutes themselves that "the Company was supposed to confer with the Union on these lines of progression before they were established, and the Company had not done this". Moreover, if the subject of the protest had been the integration of Negro employees ahead of white employees, it would seem more likely than not that the protest would have related to the three departments where Negro employees were placed ahead of white employees rather than being limited to the Furnace department. [57]

■ 3. During the trial, the Attorney General asserted the further charge that the Union should have been objecting since 1962 to the application to the Negro employees of the progression procedure that the first man to reach a job is the first to progress to the next job. However, this claim would, in the factual circumstances of this case, have put the Union in the position of negotiating, not for the abrogation of a procedure established or applied to subordinate the promotional rights of Negro employees, but rather for the establishment of a preferential exception.[58]

■ 4. By reason of the assertion of these claims against the Union, it

---

56. Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

57. In the interest of accuracy, it should be noted that the president of the local Un-

ion at that time was not the same man who now holds the office and testified at the trial.

58. Several weeks after the trial had ended, the Attorney General filed a "motion for

should in fairness be said that the evidence not only cannot sustain the claims but convincingly showed to the contrary that the Union has fully cooperated with the Company in the implementation of equal employment opportunity, that the Union has fairly and impartially represented the Negro employees of this Company, and that Negro employees serve as officers and as members of the grievance and negotiating committee of the Union.

*P. Wages and earnings:*

 It is not alleged or argued that there is a discrimination in wage rates and earnings which in itself constitutes a violation of the statute. Instead, the proposition which the Attorney General has argued on this subject is the theory that because of the other matters which are alleged to constitute discrimination, and which have been analyzed, there are more white employees than Negro employees in the higher paying jobs.

For this theory, the Attorney General has prepared comprehensive and detailed exhibits setting forth such statistics as average hourly earnings and comparative wage rates and cites these statistics, not as evidence of discrimination as such, but rather as evidence that differences in earnings are proximately caused by the matters which are alleged to constitute discrimination. The court has accordingly taken these statistical exhibits into consideration throughout analysis of the issues of this case.

It should be pointed out, however, that in so doing, the court could not properly consider only these statistics and disregarded the remainder of the evidence. The premise that there are more white employees than Negro employees in the jobs in the upper echelons of the wage

rates is true enough. However, in drawing the conclusion that this is the proximate result of prohibited discrimination, the Attorney General is again asking the court to accept statistics on their surface without considering the complete evidence of the case.

This may be illustrated by the exhibit which shows that during the first six months of 1968, 61 Negro and 297 white employees had average hourly earnings over $3.75 and that 254 Negro and 108 white employees had average hourly earnings under $3.75. The difficulty is that these statistics cannot be considered in isolation from the rest of the evidence. For example, the court cannot be expected to disregard the undisputed evidence that there are over 150 Negro employees who have voluntarily frozen themselves on jobs which pay less than $3.75 per hour. Obviously, then, the reason that over half of the 254 Negro employees who earn less than $3.75 are in this category is because they have voluntarily frozen themselves there.

The court similarly cannot be expected to disregard the fact that other of these 254 employees have voluntarily declined offers of training for jobs which could have placed them in the category of average hourly earnings in excess of $3.75. For example, Nathaniel Grant, a Negro employee in the Mill Auxiliary department, accepted training on the Inspector and Yardman jobs, is working those jobs, and is shown on the exhibit prepared by the Attorney General as having average hourly earnings of $3.91. A the same time, Tommy Hudson, a Negro employee in the Mill Auxiliary department who testified at the trial that he declined the Company's offers of training for the Inspector, Yardman, and Assistant Foreman jobs in 1965, is

---

temporary restraining order and for order to negotiate" which was apparently another repetition of the theory, which cannot be sustained on the facts of this case, that the court should order the Union to demand the abrogation with respect to Negro employees of the progression

procedure that the first man to reach a job is the first to advance to the next job.

This motion was not brought on for hearing, and the Union was given no opportunity to respond to it.

shown on the exhibit as having average hourly earnings of $3.37. It is therefore not unreasonable to say that Mr. Hudson, as well as the other employees who declined offers of training for these jobs, may well have placed themselves in the position of being among the employees with average earnings of more than $3.75 per hour had they accepted the Company's offers of training.

*Q. Pattern or practice of resistance:*

The ultimate issue, as framed by the pre-trial order, is whether there is a pattern or practice of resistance within the meaning of section 707.

1. The meaning which should be ascribed to the pattern or practice of resistance terminology is not defined in the statute itself but is the subject of explanations provided by the legislative history. The prepared explanation of the meaning of this section stated that "The Attorney General may obtain relief in public accommodations and employment cases only where a pattern or practice has been shown to exist," that a pattern or practice would be present only when there is a denial of rights which is "repeated, routine, or of a generalized nature", and that "As a further safeguard, the bill requires a showing that those engaged in the pattern or practice had the intention to deprive others of their rights under title II or title VII." [59] At another point in the legislative history, it was explained that section 707 "limits the Attorney General to cases involving a pattern or practice of violations of rights protected by these titles" and, providing a rather easy example, that "an establishment or employer that consistently or avowedly denies rights under these titles is engaged in a 'pattern or practice of resistance.' " [60]

▉ It is obvious enough, however, that Congress has not established the precise metes and bounds of the pattern or practice terminology and that it will be the responsibility of the courts to develop this point on a case-by-case approach.

▉ 2. Putting aside for the moment the subjects of the Roll Change Helper job and temporary assignments from the Extra Board, the evidence of this case establishes conclusively, and the court finds without hesitation, that the Company is not engaged in a pattern or practice of resistance. To the contrary, on the facts presented by the evidence in this case, it would be more accurate to say that the Company and the Union are engaged in a pattern of compliance and implementation of equal opportunities in employment.

3. That, however, is not the end of the necessary judicial inquiry. There remain the questions of whether the findings regarding the issues of the Roll Change Helper job and temporary assignments from the Extra Board should be regarded as constituting a pattern or practice of resistance and, if not, the relief which the court could properly grant on these issues.

This subject will now be analyzed by the court in the following section of this opinion.

*R. Relief:*

The initial inquiry on this point is the scope of the relief which the courts are authorized to grant in actions brought under section 707.

There are at least three interpretations which suggest themselves: (a) That relief is appropriate in a section 707 action only with respect to findings of patterns or practices of resistance; (b) that the authority of the courts to grant relief in actions brought under section 706 by individuals acting in the capacity of "private attorney generals" [61] should be read by implication into sec-

---

59. The Meaning of "Pattern or Practice" in Civil Rights Bill H.R. 7152, As Amended. 110 Cong. Record 14270 (June 18, 1964) ; BNA, p. 346.

60. Senator Humphrey at 110 Cong. Record 14239 (June 17, 1964).

61. Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968).

tion 707, so that relief may be granted with respect to a single unlawful employment practice although it may not constitute a pattern or practice of resistance; and (c) that the courts should exercise their general equity jurisdiction to grant such relief as is deemed appropriate and just in the context of each particular case.

The legislative history on this point consists of the explanations that "The Attorney General may obtain relief in public accommodations and employment cases only where a pattern or practice has been shown to exist" [62] and that section 707 "limits the Attorney General, when he finally is authorized to bring enforcement suits, to obtaining relief only when he can prove a 'pattern or practice' of resistance to desegregation." [63]

It therefore may be that while the judicial authority to grant relief in a section 706 action extends to each instance of an unlawful employment practice shown to exist, the Congress intended for the courts to grant relief in a section 707 action "only where a pattern or practice has been shown to exist." If this is the proper interpretation, the court would then be required to resolve the question of whether the findings which have been entered with regard to the essential similarity of the Roll Change Helper and Roll Changer Grade III and temporary assignments from the Extra Board may be regarded as constituting a pattern or practice of resistance.

However, the court is not prepared to adopt that approach. This question is the one point in the case which has not been thoroughly developed through the briefs and argument, since the Attorney General has insisted that there is a generalized pattern or practice of resistance, the defendants have insisted that there is not, and neither side has explored the area lying between these positions.

The court is therefore not announcing a general principle of immutable application. In another case, given a full development of the point, a different interpretation might be adopted. But for purposes of this case, it is the opinion of the court that the proper approach is to exercise its inherent equitable jurisdiction and grant the relief which is deemed appropriate in the circumstances of this case.

Adopting this approach, it is the conclusion and holding of the court that relief is appropriately to be granted with respect to the issues of the essential similarity of the Roll Change Helper and Roll Changer Grade III and with respect to temporary assignments from the Extra Board.

*S. Intent:*

One of the issues framed by the pretrial order is the question of "whether the defendant Company has had the intent which section 707 of Title VII requires the plaintiff to prove to establish a violation." The matters of law and of evidence relating to this subject are as follows:

1. At the outset, the basic thesis of the Attorney General's position on this issue is the argument that "The best of motives will not save an employer or union which has violated the statute." The argument has an element of question-begging, since the question of intent enters into the determination of whether an employer or a union has violated the statute. Nevertheless, the court agrees in principle with the argument. The most sincere motives and intentions would be worth nothing where not accompanied by actions and by implementation of equal employment opportunity, for it is as true here as it is in every area of human

---

62. The Meaning of "Pattern or Practice" in Civil Rights Bill H.R. 7152, As Amended. 110 Cong. Record 14270 (June 18, 1964) ; BNA, p. 346.

63. 110 Cong. Record 12620 (June 3, 1964).

experience that actions speak louder and with considerably more authority than words. A policy of attitude without actions and a policy of actions without attitude are both doomed to failure. Both factors are indispensable components in achieving the goal of equal opportunities in employment.

 This case, however, is not one of intention without actions or of actions without intention. After having heard the testimony and observed the witnesses during the eight days of the trial, the court is firmly convinced that it has been the genuine and sincere intention of this Company and Union to provide equality in employment opportunities for the Negro employees and that this intention has been implemented in the actions taken by them.

2. The applicable provision of section 707 is that the alleged pattern or practice is "intended to deny the full exercise of the rights herein described", and like every issue in the case, the meaning which should be ascribed to this provision has been the subject of argument.

The Attorney General takes the position that the standard of intent under section 707 is satisfied "where defendants are aware of the consequences of their acts" and that the only relevant elements for judicial consideration are the conduct of defendants and the effect of such conduct. For this position, the Attorney General relies on the chapter of the legislative history consisting of the defeat of an amendment to section 703 which would have prohibited discrimination "solely" because of race and on cases from other areas of the law dealing with issues of motive and intent.[64]

The Company takes the position that the standard of intent under section 707 requires something more than the standard of intent in a section 706 case and relies on the explanations in the legislative history of the element of intent, such as the explanation that "As a further safeguard, the bill requires a showing that those engaged in the pattern or practice had the intention to deprive others of their rights under title II or title VII." [65] The court is further cited on this point to Judge Hogan's analysis in the *Dobbins* case that in a section 707 action, "The plaintiff must show that a pattern or practice exists and that it is of such a nature as to deny the exercise of the protected civil rights and that it was so intended by the defendant." [66]

This is an interesting question of statutory construction, but the court has concluded that this case is not the appropriate vehicle for resolution of it.

It is not necessary to resolve the question with respect to the Roll Change Helper and Roll Changer Grade III jobs because the court would certainly not withhold relief on this issue in the face of Vice-President Blake's expressed opinion that the jobs had become similar.

It is likewise not necessary to resolve the question with respect to Extra Board assignments. Since the court has held that relief should be granted on this issue without regard to whether it constitutes a pattern or practice of resistance, it would be an academic exercise to resolve the question of the standard of intent required by section 707.

 3. It is not material because of the disposition that the court has made of the issue of intent. But in view of the Attorney General's strenuous objection to it, the court will comment further in this connection on the testimony of Dr. Richard Rowan.

64. E. g., NLRB v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963); NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967); NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967).

65. 110 Cong. Record 14270 (June 18, 1964); BNA, p. 346.

66. Dobbins v. Local 212, International Brotherhood of Electrical Workers, 292 F.Supp. 413 (S.D.Ohio 1968).

Dr. Rowan is professor of industrial relations at the Wharton School of Business of the University of Pennsylvania and, according to the testimony and the articles and books prepared and edited by him which were brought to the courtroom during the trial, he has engaged in extensive study and research during the past several years in the field of equal employment opportunity in American industry.

The point of Dr. Rowan's testimony was that the Connors Steel plant in Birmingham was one of the subjects of the study, which he prepared in 1964 under the sponsorship of the Ford Foundation, entitled "Selected Studies of Negro Employment in Birmingham, Alabama." According to Dr. Rowan's testimony, it was a purpose of this study to evaluate whether the equal employment opportunity policies of the companies studied consisted of token efforts only or whether they were being implemented through actions, and he testified that he was of the opinion that the policy of this Company, as he viewed it in 1964, was one of genuine action and not words.

The Attorney General's objection to this testimony was based on the theory that it was an attempt to substitute the judgment of the witness for the judgment of the court with regard to compliance with the law and with regard to the issue of intent.

Had that been the import of the testimony, the court would agree with the objection. But there is no doubt, from the testimony itself and the arguments of counsel, that such was not the case and that the evidence was offered as representing the opinion of a disinterested observer with regard to the situation of the Company's plant as he viewed it in 1964. For this purpose, the court considered the testimony as competent and admissible.

*T. Costs:*

[106] The court finds that the costs in this action (other than attorneys' fees) should be divided in some manner between the plaintiff and the defendants. If that division were made on a percentage basis by comparing the number of discriminations charged in the complaint and amended complaints and at the trial with the instances of discrimination found by the court from the evidence, only a small percentage of such costs would be charged against the defendants. However, the court does not believe that under all the circumstances this is the proper method to be followed and is of the opinion that a just result will be achieved if such costs are assessed three-fourths against the plaintiff and one-fourth against the defendant Company.[67]

## II.

It has not been the least of the complexities of this case that the issues which were tried and have been argued ranged well beyond the issues as set forth in the pre-trial order. But rather than hold the case to the pre-trial order, the court has taken the approach of considering and entering findings of fact and conclusions of law with respect to every issue, allegation, and claim, regardless of the time that it was raised and regardless of the manner in which it was raised. While the court is hopeful that this approach will not encourage the injection of new issues after the pre-trial in future cases, the court is equally satisfied that the full consideration of every issue was justified here by the importance of the case and in the interest of complete and final adjudication of this protracted litigation.

Therefore, by way of summary of the findings and resulting conclusions which have been entered in this case, the court will first set forth the answers to the issues of fact as framed by the pre-trial

---

**67.** The court will reserve for future determination the question of whether attorneys' fees are allowable to the de- fendants as a part of the costs and, if so, the amount which should be allowed.

order and then set forth the answers to the issues which were not included in the pre-trial order.

The answers to the issues as framed by the pre-trial order, and the findings of the court with respect thereto, are as follows:

1. Whether the Company by maintaining two separate seniority departments, Mill Tonnage and Mill Auxiliary, maintains an artificial classification that discriminates against Negro employees because of their race.

No.

2. Whether the jobs of Catcher and Layover, Furnace Helper and Heater Helper, and Roll Change Helper and Roll Changer Grade III are essentially similar so as to constitute racial discrimination and entitle incumbent employees in the Mill Auxiliary department to relief under Title VII.

The jobs of Roll Change Helper and Roll Changer Grade III are essentially similar, and although the evidence does not show that this essential similarity constitutes racial discrimination, the court will order the transfer of the incumbent Roll Change Helpers to the Roll Changer Grade III job.

The jobs of Catcher and Layover and Furnace Helper and Heater Helper are not essentially similar.

3. Do the standards and procedures by which the Company gives employees preference for job assignments and promotions within a seniority department discriminate against Negro employees at the Birmingham plant because of their race?

No.

4. Does the requirement that employees take and pass certain written tests in order to advance to the jobs of Weighman in the Finishing department and Yardman, Assistant to Foreman, and Inspector in the Mill Auxiliary department discriminate against Negro employees because of their race?

Not in the particular circumstances in which such tests were adopted and used to select the employees who had the ability to be trained for the arithmetical computations of the jobs. However, for the reasons set forth in the analysis of this issue, the court will direct the Company to state whether the tests will again be used, and if the answer should be other than an unqualified negative, the court will take the matter under further consideration.

5. Do the requirements and procedures for an employee to obtain entry into a seniority department or to transfer from one seniority department to another discriminate against Negro employees because of their race?

No.

6. Whether the policy that an employee who transfers from one seniority department to another is assigned to the entrance job in the new department and receives no credit in the new department for seniority previously earned, while retaining seniority previously earned in his old department for purposes of layoff, discriminates against Negro employees at the plant because of their race.

No.

7. Whether the Company has made racially discriminatory temporary assignments within the period of time covered by the suit.

Yes, with respect to temporary assignments from the Extra Board.

8. Whether the Company has made racially discriminatory assignments to apprentice jobs within the period of time covered by the suit.

No.

9. Whether the Company's job assignments have discriminated against Negro employees with respect to training within the period of time covered by the suit.

No.

10. Assuming the answer to any one of questions 1–9 is in the affirmative, whether the defendant Company has had the intent which section 707 of Title VII requires the plaintiff to prove to establish a violation.

This issue is not appropriate for resolution in this case.

11. If a violation of section 707 of Title VII is proved, what relief is appropriate?

The court will enter an order granting relief with respect to the issues of the essential similarity of the Roll Change Helper and Roll Changer Grade III and temporary assignments from the Extra Board.

This concludes the issues as they were framed by the pre-trial order. The answers to the issues not covered by the pre-trial order, and the findings of the court with respect thereto, are as follows:

12. Whether Negro employees are given the same opportunity to demonstrate ability to hold jobs as is given to white employees.

Yes.

13. (a) Whether the Science Research Associates aptitude test used by the Company was a professionally developed ability test in the sense that it was developed by professional psychologists.

Yes. (It is appropriate to reiterate that there was no claim that the United States Employment Service test used before 1962 and at the present is not a professionally developed ability test).

(b) Whether, in the factual circumstances of this case, it constitutes racial discrimination to use the Science Research Associates and United States Employment Service aptitude tests without having a test validation by a professional psychologist.

No.

14. Whether the Company has discriminated against Negro employees with respect to assignments to and transfers from the Labor Pool.

No.

15. Whether the unrestricted plant-wide seniority and bidding plan proposed by the Attorney General is appropriate in the factual circumstances of this case.

No.

16. Whether the Union is representing the Negro employees of the Company fairly and impartially.

Yes.

So there will be no further question about the matter, it should be said that this constitutes all of the issues, allegations, and claims which have been raised in this court—by complaint, evidence, and brief—and that there is none other.

### III.

In coming to the end of the case, the court wishes to express this concluding observation.

Out of the multitude of allegations which the Attorney General asserted during the pre-trial stages and during the trial, the court heard evidence sustaining the allegations regarding temporary assignments from the Extra Board and the Roll Change Helper job. Otherwise, however, the inescapable point which emerged when all the evidence was in and all the arguments were concluded was that the facts of this case will simply not sustain the allegations asserted and the result sought.

It should therefore be reiterated that the broad propositions urged by the Attorney General are neither approved nor disapproved by the court. They may be applicable to the facts of other cases, but the point is that they are not applicable to the facts of this case. It should similarly be once again emphasized that no more should be read into the findings and conclusions of this case than is justified by the particular facts on which they are predicated. For the cases which will come before the courts in the future, each will have to stand on its own facts and not on this case.

### JUDGMENT AND ORDER

In conformity with the Findings of Fact and Conclusions of Law of the court contemporaneously entered herein,

It is ordered, adjudged, and decreed by the court as follows:

1. That the relief prayed for by the complaint as amended is hereby denied except as hereinafter provided.

2. That with respect to its Connors Steel plant located in Birmingham, Alabama, the defendant H. K. Porter Company, Inc. (herein referred to as "the Company") is hereby enjoined and affirmatively ordered with regard to temporary assignments from the Extra Board as follows:

(a) The Company is hereby enjoined and restrained from giving white employees preference over Negro employees for assignments from the Extra Board to temporary vacancies in jobs.

(b) The Company is hereby enjoined and restrained from using or considering in the making of temporary assignments from the Extra Board the standard or factor of prior experience on the job or jobs to be filled and the standard or factor of availability for the duration or period of time that the job or jobs to be filled are expected to be open.

(c) The Company is hereby affirmatively ordered to use and follow in the making of temporary assignments from the Extra Board the following procedure and the following procedure only: First, employees on the Extra Board who hold seniority in the department containing the job to be filled shall be called for assignment to such job in the order of their seniority in such department, beginning with the employee having the longest departmental seniority. Thereafter, employees on the Extra Board shall be called for assignments to jobs in the order of their Company age, beginning with the employee having the longest Company age.

(d) Nothing set forth herein shall be construed to require the Company to call for temporary assignments from the Extra Board employees who request not to be assigned to the job or jobs to be filled, or who lack the physical fitness or ability to perform the job or jobs to be filled, or who would have to be paid at overtime rates for working the job or jobs to be filled.

3. That the Company is hereby ordered to take the following action with regard to the job of Roll Change Helper:

(a) Within ten days after entry of this order, the Company shall take all such steps as are necessary to abolish the Roll Change Helper job, transfer the regular incumbent employees of the Roll Change Helper job to the Mill Rolling department, and place such incumbent employees of the Roll Change Helper job in the Roll Changer Grade III job.

(b) Within ten days after the taking of such steps, but not later than twenty days after entry of this order, the Company shall prepare, file with the court, and serve on counsel for the other parties a written report setting forth the steps taken in compliance with the directions set forth in paragraph 3(a) above, the date on which such steps have been taken, and the names of the employees who have been transferred to the Mill Rolling department and placed in the Roll Changer Grade III job in accordance with paragraph 3(a) of this order.

4. That the following action is hereby ordered with regard to the arithmetic tests for selection for training or advancement to the jobs of Inspector, Assistant Foreman, and Yardman in the Mill Auxiliary department and Weighman in the Finishing department:

(a) Within ten days after entry of this order, the Company shall prepare, file with the court, and serve on counsel for the other parties a document which shall set forth in writing the Company's answer to the question of whether any tests will again be used with respect to employees now or hereafter in the Mill Auxiliary department and the Finishing department for purposes of selection for training for or advancement to the jobs of Inspector, Assistant Foreman, or Yardman in the Mill Auxiliary department and Weighman in the Finishing department.

(b) If the answer to such question is in the affirmative or other than an unqualified negative, then, within ten days after service of the document prepared in accordance with paragraph 4(a)

of this order, the plaintiff may file with the court a document in writing setting forth the plaintiff's position regarding the order that should be entered on this subject in view of such answer to the question.

5. That in accordance with the provision of section 706(k) that in any proceeding under Title VII the United States shall be liable for costs the same as a private person, the costs of this action (excepting the matter of attorneys' fees, which is reserved) are taxed in the proportion of three-fourths against the plaintiff and one-fourth against the Company.

6. That the court retains jurisdiction of this action to the limited extent of (a) carrying out the procedures set forth in paragraphs 3 and 4 of this order and (b) determining the question of attorneys' fees in accordance with section 706(k) of Title VII.